**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**UNITED STATES OF AMERICA,**

**v.**

**MARKELL BROWN,**
**a/k/a/ "Sayboy," and**

**TERENCE SHAW,**
**a/k/a "Sweet Meat,"**

***Defendants*.**

**Criminal Action No. 20-864**

**OPINION**

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of three pairs of motions filed by Defendants Markell Brown and Terence Shaw (collectively, the "Defendants"). First, pursuant to Federal Rule of Criminal Procedure 29, Brown and Shaw each move for acquittal. See ECF No. 231 ("Shaw Acquittal Motion"); ECF No. 232 ("Brown Acquittal Motion," and collectively, the "Acquittal Motions"). Second, pursuant to Federal Rule of Criminal Procedure 33, Brown and Shaw each move for a new trial based on the Court's decision to remove a juror for cause during deliberations. See ECF No. 235 ("Brown First NTM"); ECF No. 236 ("Shaw First NTM," and collectively, the "First NTMs"). Third, again pursuant to Rule 33, Brown and Shaw separately move for a new trial based on recent Third Circuit caselaw that they argue made the admission of certain witness testimony improper. See ECF Nos. 244, 244.1 ("Shaw Second NTM"); ECF No. 246 ("Brown Second NTM," and collectively, the Second NTMs). The Government opposes each of these Motions. See ECF No. 233 ("Acquittal Opposition"); ECF No. 240 ("First NTM Opposition"); ECF No. 248 ("Second NTM Opposition").

For the reasons set forth below, each Motion is **DENIED**.

# I. FACTUAL BACKGROUND

## A. Defendants' Criminal Conduct

Defendants were part of a criminal street gang operating in and around Jersey City, New Jersey known as the Neighborhood Bloods ("NHB"). See, e.g., Trial Tr. at 1747:1–7; 1749:12–18; 2135:8–2136:6; 2148:4–2149:11. NHB was involved in drug trafficking, and the Defendants sold narcotics on its behalf in its territory. See, e.g., id. at 118:14–18; 203:12–204:20; 2142:22–2143:20; 2146:16–2147:2; 2149:10–2150:22; 2436:9–14; 2439:14–2440:1; 2446:11–23; 2698:2–11. They also engaged in other violent behavior, including murder, to improve their standing within NHB. See id. at 250:7–15; 1909:17–1911:13; 2136:17–2137:8; 2142:22–25; 2143:21–2145:4; 2198:25–2199:6. This violent conduct was typically directed at NHB's rival, a neighboring gang called Sex, Money, Murder ("SMM"). See id. at 129:16–23; 242:6–9; 283:6–18; 2143:21–2145:4; 2441:14–2442:7. The two gangs had been involved in a long-running blood feud and, as part of this feud, various members of SMM killed multiple members of NHB, including Brown's brother. See id. at 129:16–23; 2151:3–2154:11; 2156:18–2157:9; 2162:17–2165:8; 2522:15–2525:16.

In late-2016 and early-2017, as a part of this ongoing feud, the Defendants and a high-ranking member of SMM, Ishear Bailey, a/k/a "Ottie" ("Bailey"), engaged in a series of antagonistic and violent interactions that ultimately resulted in the murders of Bailey, Bailey's girlfriend, Janaya Lee, and an associate of the Defendants, Quadel Chisolm ("the Murders"). See id. at 1133:1–19; 2144:8–14. Most notably, on January 1, 2017, Brown got into a fight with Bailey outside of a Newark nightclub. See id. at 1773:2–1778:19. During that altercation, Brown ripped a chain off of Bailey's neck and kept it. See id. That same day, to taunt Bailey, Brown and Shaw posted photos of themselves wearing the chain on social media with the statement, "I got the keys to the streets." See id.; see also id. at 1153:8–1164:15. In response, Bailey created six key chains

that included photos of different NHB gang members that SMM had murdered (including Brown's brother) and shared them in a social media video in which he stated they represented "the real keys to the streets." See id. at 1780:22–1781:25; see also id. at 662:7–12; 1174:7–1177:2; 1178:6–23.

Defendants responded to what they viewed as an act of disrespect by conspiring to murder Bailey. Brown first attempted to kill Bailey with a different associate, Niam Richardson, on January 6, 2017—the same night Bailey posted the video of the key chains. See id. at 1783:25–1786:7. During this attempt, Brown used a 10-millimeter handgun and fired "about 18" shots in the direction of Bailey and other SMM members that they saw standing outside of a school on Dwight Street in Jersey City. See id. at 1787:4–1790:9; 1796:2–21; 1798:1–3. After this attempt, Brown went to Shaw's residence and left the gun with Shaw. See id. at 1790:16–1794:12. However, Brown ultimately failed to kill Bailey. See id. at 1795:22–1796:1. The following day, detectives recovered 12 shell casings from this firearm littered across a stretch of at least seven residences on Dwight Street. See id. at 1982:23–1983:20; 1986:4–1988:17.

Undeterred, Defendants plotted a second attempt on Bailey's life. Their planning this time was far more comprehensive. Shaw obtained a stolen U-Haul truck that Defendants used to transport themselves to and from Bailey's apartment building on Fulton Avenue in Jersey City. See id. at 985:3–987:1; 988:24–989:11; 991:3–16; 1014:2–1021:18; 1299:2–1300:24. The Defendants obtained disguises (specifically dreadlock wigs) that they wore to avoid detection; purchased walkie-talkies to communicate with one another; and recruited Chisolm to aid in the attempt. See id. at 569:16–19; 608:19–610:11; 1481:19–1484:14; 1486:20–1488:7; 1490:23–1491:19; 1492:13–1495:19; 1524:20–1529:13; 2197:18–25. Lacking sufficient ammunition for the 10-millimeter handgun, they also planned to use a 9-millimeter handgun that Brown had acquired weeks earlier. See id. at 1887:10–14; 2588:24–2595:20; Gov't Ex. 300-8.

On the evening of January 16, 2017, Defendants carried out their plan—which was ultimately reconstructed through surveillance footage, cell-site location data, and eyewitness testimony. Shaw picked up the U-Haul truck on Fisk Street in Jersey City. See id. at 1001:19–1002:5; Gov't Ex. 510. He then drove it to a dead end street near Bailey's apartment called Bayside Place. See Trial Tr. at 1578:9–1579:8; Gov't Ex. 226-1. About an hour later—and shortly before the Murders—the Brown, Shaw, and Chisolm were seen walking to retrieve the U-Haul from Bayside Place. See Trial Tr. at 542:1–543:1; 547:17–549:7. They then drove the U-Haul to Fulton Avenue and parked several doors down from Bailey's apartment. See id. at 1630:6–1643:23. Surveillance footage showed multiple people exiting the U-Haul at around 9:55 p.m. See id. at 1642:20–1643:15. Then, just after 10 p.m., a 911 call was placed reporting the Murders. See id. at 389:9–390:2; 390:23–391:6; 395:18–22; 448:4–15. Moments after that call was placed, Brown and Shaw were seen driving away in the U-Haul and later walking away from Bayside Place—all without Chisolm. See id. at 500:17–503:10; 506:23–508:20; 513:11–16; 538:1–11; 550:17–552:17; 1394:7–19; 1524:17–22; 1644:25–1646:22. Brown admitted to a fellow NHB associate, Earl Austin, that he killed Chisolm to prevent Chisolm from acting as a witness to the Murders. See id. at 2197:6–2198:8. The Defendants then proceeded to walk a block over to Stegman Street. See id. at 1672:17–1673:4. Minutes later, a black Acura TL Sedan (the "Acura TL")—the same type of car Shaw owned—was seen driving down Stegman Street. See id. at 1673:5–1677:14.

In the aftermath, Defendants took steps to cover their tracks. Richardson helped Brown reserve a hotel in North Bergen, New Jersey. See id. at 1799:19–1802:18; 1948:9–19. There, Brown admitted to Richardson that he murdered Bailey and Lee. See id. at 1806:3–1808:18. He also admitted Shaw was present at the scene and that he had to pull Shaw away from trying to help someone (presumably Chisolm). See id. at 1808:1–18. Shaw then picked Brown up from the hotel

to drive to Paterson, New Jersey and dispose of the firearm they used to commit the Murders. See id. at 1807:12–23; 1948:25–1949:3; see also id. at 1950:6–24 (cell-site location data revealing that the Defendants went to Paterson around 3 a.m. on the morning of January 17, 2017). Several hours later, at around 7:30 a.m., Shaw also called and hired an individual to clean the interior of his Acura TL. See id. at 1277:20–1279:9, 1698:24–1702:2.

When investigators arrived at the scene, they discovered six 9-millimeter bullet casings. See, e.g., id. at 632:2–633:12; 656:8–20; 672:2–5; 1075:20–1076:6. The casings matched casings that were discharged from a firearm several months later in Paterson—the same location Brown and Shaw went to dispose of the murder weapon. See id. at 840:13–19; 842:10–843:3; 2382:11–2383:23; 2386:1–16; 2389:6–10. In the days following the Murders, communications and conduct by Brown also supported an inference that he and Shaw participated in the Murders and sought to conceal them. See id. at 2682:5–2684:19; 2695:4–2697:3; Gov't Ex. 300–19.

On October 5, 2020, a federal grand jury returned a ten-count Indictment against the Defendant. See ECF No. 7. Count One charged each with conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); Counts Two, Five, and Eight charged each with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); Counts Three, Six, and Nine charged each with using and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and Counts Four, Seven, and Ten charged each with causing death through use of a firearm, in violation of 18 U.S.C. § 924(j)(1). See id. Counts Two through Four of the Indictment pertained to the murder of Bailey; Counts Five through

Seven pertained to the murder of Lee; and Counts Eight through Ten pertained to the murder of Chisolm. See id.[1]

B. **The Trial**

Trial commenced on November 4, 2025. In its case-in-chief, the Government presented testimony from twenty-five lay and expert witnesses and various forms of physical evidence, including surveillance video, cell-site location data, recorded phone calls, photographs, songs, and the retrieved bullet casings. Five police officers testified as lay witnesses: Detective William Costigan; retired Captain Matthew Stambuli; Sergeant Guershon Cherilien; Detective Brenton Porter; and Sergeant Nicole Bradley. Relevant here:

- Detective Costigan offered testimony related to: (1) indicators of gang membership; (2) gang drug dealing practices and retaliatory shootings; and (3) the relevance of certain colors, words, and numbers as gang symbols. See Trial Tr. at 122:21–123:13; 123:17–124:13; 126:3–127:24; 176:8–178:5; 237:4–10; 238:1–17.

- Captain Stambuli offered testimony related to: (1) gang members' use of social media and self-identification practices; (2) Chisolm's appearance on the night of the Murders; and (3) violent trends in Jersey City. See id. at 1111:11–20; 1117:21–1118:6; 1118:17–1119:24; 1119:11–1120:24; 1130:11–24; 1137:6–8.

- Sergeant Cherilien offered testimony related to: (1) Shaw's Acura TL; (2) practices commonly associated with persons who commit homicides; and (3) the meaning of certain phrases used by the Defendants. See id. at 1380:3–22; 1489:15–1490:19; 1518:1–15; 1553:15–18.

- Detective Porter offered testimony related to Shaw's Acura TL. See id. at 1582:14–1584:21; 1587:9–1590:14.

- Sergeant Bradley offered testimony related to: (1) gang members' use of social media; (2) certain practices of gang members related to gang territory, gang rivals, and member identification; (3) the meaning of certain phrases used by the Defendants; and (4) the identity of certain gang members based on nicknames, photos, and voice recognition. See id. at 2430:20–2432:12; 2443:24–2445:14; 2571:1–2572:17; 2577:7–2584:13; 2604:24–

[1] With Defendants' consent, the Government moved to amend the Indictment to change the reference to "Victim-1" in Count Ten to "Victim-3." See ECF No. 110. The Court granted the motion to amend, and a Corrected Indictment was filed against the Defendants on October 22, 2025. See ECF Nos. 119, 120. No changes were otherwise made to the substance of the Counts asserted against each Defendant.

2605:2; 2644:14–25; 2647:9–2649:5; 2649:21–2651:23; 2653:15–2655:25; 2659:1–2660:24; 2706:15–2701:1; 2733:24–2734:4.

**C. Jury Deliberations and the Discharge of Juror No. 4**

On December 4, 2025, following the close of the Government's case-in-chief and Brown's rebuttal case, the case was submitted to the jury. See id. at 2892:11–17. Over the first three days of deliberations, the Court received seven notes from the jury. See ECF Nos. 176, 179, 204, 207. In Juror Communication No. 4, the note indicated that "[s]ome jurors are struggling with understanding/accepting the role of the jury to draw conclusions (specifically w[ith] circumstantial evidence)," that the jury was "directed to consider both direct and indirect evidence, but some are too focused on direct," and that "there has also been discussion around punishment." See ECF No. 179 at 2. In response, the Court reread instructions explaining the types of evidence jurors can and should consider and reiterating the prohibition on considering punishment in reaching any conclusions regarding innocence or guilt. See Trial Tr. at 3496:5–3501:4.

On December 9, 2025, at the end of the fourth day of deliberations, the Court received Juror Communication No. 8 from the jury. See ECF No. 207. It stated

> We are continuing to struggle with the decision regarding racketeering. Decisions go from unanimous to not. **Some jurors are concerned by a comment made by a juror that they are "mad/angry" at the prosecution and that a bias is taking place in light of the evidence**. We cannot proceed at the moment.

Id. (emphasis added) (the "At-Issue Comment"). In response, the Government moved the Court to question each juror about potential juror misconduct. See ECF No. 180. Defendants opposed this request and moved for a mistrial. See ECF No. 181. Alternatively, they requested the Court reread certain jury instructions related to the jury's role in evaluating evidence free of bias. See id. After oral argument, the Court granted the Government's motion. It determined that in the context of all prior notes (including Juror Communication No. 4), there were now three indications that jurors may not be following the courts instruction to consider all evidence or were being driven

by impermissible considerations. See Trial Tr. at 3551:1–3557:4. Taken holistically, the Court concluded it had substantial evidence of potential juror misconduct and that it was appropriate to proceed with individual voir dire. See id.; see also United States v. Boone, 458 F.3d 321, 329 (3d Cir. 2006).

During this voir dire, each juror was questioned in the jury box in a sealed courtroom, and the jury ceased deliberations. See Trial Tr. at 3559:10–13; 3559:22–24. The Court read Juror Communication No. 8 to each juror, asked each if he or she was aware of the note and who made the At-Issue Comment referenced in it, and then asked the following three questions, largely derived from United States v. Kemp, 500 F.3d 257, 273 (3d Cir. 2007):

(1) Are you personally experiencing any problems with how the deliberations are proceeding, without telling the Court anything about the vote as to guilt or innocence, or anything about the substance of the deliberations? If yes, describe those problems.

(2) Are all the jurors discussing the evidence or lack thereof?

(3) Are any jurors not following the Court's instructions on the law?

See Trial Tr. at 3557:23–3558:16; 3560:16–21. The Court also asked appropriate follow-up when necessary. Eleven jurors identified Juror No. 4 as the juror who made the At-Issue Comment and nearly all stated, in some capacity, that they believed Juror No. 4 was biased against the Government. In relevant part, each Juror testified as follows:

- Juror No. 1 stated Juror No. 4 had made comments like the At-Issue Comment "repeatedly over the past four or five days" of deliberations. Tr. at 3566:7–16. They also stated they were "having problems" with deliberations because Juror No. 4 was "refusing" to consider and "ignoring some witness testimony and some evidence."[2] Id. at 3564:16–3565:11; 3566:20–23. When asked if Juror No. 4 had "any bias," they stated "[a] little bit yes," and explained that the bias appeared to be based on the government's delay in prosecuting the case. Id. at 3565:25–3566:12.

- Juror No. 2 said Juror No. 4 "thinks that they are considering the evidence," but they did not think that she was doing so. Id. at 3569:1–5. They also stated they did not believe

[2] The Court uses they/them/their pronouns to refer to each juror excluding Juror No. 4, for whom the Court uses she/her/her pronouns. This distinction is used to avoid confusion over who each pronoun is describing.

Juror No. 4 was following the Court's instructions and considering all evidence. See id. at 3570:8–17. They explained Juror No. 4 "discusses" the evidence, but that she appeared to develop "a story in [her] head" early in the trial and was not willing to let go of that view despite the evidence presented. Id. at 3569:18–3570:7. They further stated they were "disturbed" by a pattern during deliberations where the jury would "start to make progress," and then when they believed they could move on, Juror No. 4 brought them "back to square one." Id. at 3568:15–3568:25. They believed Juror No. 4 was biased and had "a notion in [her] head about the way [the case] was presented, and [she's] not willing to stray from that notion." Id. at 3570:18–24.

- Juror No. 3 characterized the jury as at a "roadblock" because Juror No. 4 kept going "back and forth on her opinions." Id. at 3573:14–3574:9. When asked as a follow-up if the going "back and forth" was based on consideration of the evidence "fully and completely," they stated "[t]hat I'm not sure of . . . it seems maybe not . . . I can't say for sure." Id. at 3574:10–22. Ultimately, they said "Maybe no." Id. at 3574:23–3575:1. They stated that they did not believe Juror No. 4 had a bias and that all jurors were following the Court's instructions, but hesitated when responding to the question regarding adherence to the instructions. Id. at 3575:10–18. When asked about this hesitation, they stated they were "unsure how much [they] can say." Id. at 3575:16–18.

- Juror No. 5 stated they were having problems with deliberations and that Juror No. 4 was "upset or mad about the presentation of the case." Id. at 3579:4–14. They then explained they believed Juror No. 4 felt "manipulated" and that "it's hard for [her] to accept the evidence brought to them and being able to use that based off of how [she] feels personally." Id. at 3579:15–23. They stated they were unsure if Juror No. 4 was biased. See id. at 3579:24–3580:1. When asked whether all jurors were discussing evidence, they stated that "if we're talking about instructions, logical reasoning, then [Juror No. 4] is not providing that," and suggested she may be acting on a "hunch". Id. at 3580:2–9. They further stated Juror No. 4 "think[s]" they are following the Court's instructions, but they did not believe she was doing so. Id. at 3580:17–24.

- Juror No. 6 stated they were having problems with deliberations because they felt "a little redundant and frustrating and ineffective." Id. at 3582:19–3583:3. When asked whether they believed the At-Issue Comment was a result of bias, they respond, "I feel like that is a really strong accusation and I don't know if I made that leap" because "it's hard to question someone's objectivity because it's so personal," but then noted they believed "it would be fair to question [Juror No. 4's] objectivity." Id. at 3583:4–21. They otherwise stated they believed all jurors were discussing the evidence and following the Court's instructions. See id. at 3584:2–8.

- Juror No. 7 witnessed Juror No. 4 make the At-Issue Comment and said they believed she said it because she was "antagonistic towards the prosecution." Id. at 3586:24–3587:4; 3587:14–23. They further stated they believed Juror No. 4 was biased "against the prosecution," id., and that she was not looking at certain evidence and was deliberating "mostly based on feelings," id. at 3586:17–23; 3587:24–3588:18.

- Juror No. 8 heard Juror No. 4 make the At-Issue Comment and believed it was based on a bias. Id. at 3589:24–3590:9. They further stated they believed Juror No. 4 was "not impartial," id. at 3592:19–25, and that this was based on the At-Issue Comment and "other comments they have made," including referring to the prosecution as the "feds" with a tone that gave off an "anti-fed, anti[-]government" bias, id. at 3591:2–15; 3594:20–3595:14. They explained that they believed this bias developed "during the proceedings" because Juror No. 4 "has a problem with how [the case] was presented" and felt that the prosecution was "feeding" her a "narrative." Id. at 3592:11–18; 3594:8–12. Based on these feelings, they stated Juror No. 4 was "ignoring" evidence and "ignoring logic in a sense." Id. at 3592:1–6; 3594:13–16.

- Juror No. 9 heard Juror No. 4 make the comment and said that they were the foreperson who authored Juror Communication No. 8. See id. at 3596:10–15. They stated they believed Juror No. 4 had a bias "against the government" and had "a thumb on the side of the government that is unfair." Id. at 3597:15–3598:1. This view was based on Juror No. 4 constantly referring to the prosecution as "the feds" in a "context" that was "not positive." Id. at 3596:24–3597:10; 3599:3–6. They further explained that Juror No. 4 "often speculates, asks for evidence that doesn't exist, that was not submitted, [and] does not seem to be following the rules as they've been written in the charges." Id. at 3598:9–12. Specifically, they noted that the "reasonable doubt" instruction explains the standard does not require one hundred percent assurance or mathematical certainty, but that Juror No. 4 would state that she could not be "one hundred percent sure" the Defendants were guilty. Id. at 3598:13–3599:3. When challenged that she was not following this instruction by other jurors, Juror No. 4 would "dismiss it." Id. And when challenged by other jurors to explain the basis for her position, Juror No. 4 would not provide an answer and instead respond "I don't know, I'm just going to call out sick." Id. at 3600:1–12.

- Juror No. 10 stated they believed Juror No. 4 was biased against the Government. See id. 3601:25–3602:1. They explained that this bias arose from the fact that the prosecution stated certain evidence "would be presented during the trial," but that the prosecution "did not satisfy . . . what the juror thought was promised." Id. at 3602:17–3603:4. They further stated that they did not believe Juror No. 4 "[wa]s looking at all the evidence in its entirety." Id. at 3603:9–13.

- Juror No. 11 said they heard Juror No. 4 make various comments that were similar to the At-Issue Comment. Id. at 3605:7–9. They believed Juror No. 4 had an "impenetrable bias" that prevented other jurors from being able to "work with" or "logically talk with" her. Id. at 3605:20–3606:5. This was based on "very emotional comments" Juror No. 4 would make about "feeling as though she has been manipulated or used in some way." Id. at 3605:7–17. They stated Juror No. 4 would sometimes discuss the evidence, but at other times she would not. Id. at 3606:6–11. They further stated that they believed Juror No. 4 was following the Court's instructions "at first, but [they] started to have doubts that she was as we went along." Id. at 3606:12–19.

- Juror No. 12 stated they believed Juror No. 4 was biased because she appeared to have "a set of opinions that is . . . not necessarily related to the case and it is being applied to the case." Id. at 3608:7–11. They explained that deliberations keep hitting a "roadblock

because there is this attitude or approach: No, I'm not going to agree." Id. at 3610:7–11. And they stated that Juror No. 4 appeared to have this view because she did not trust the evidence because it was presented by the Government. See id. 3609:7–15 (analogizing the issue to someone rejecting scientific information because "the information was presented by so and so and that's why I don't believe that"). Although all jurors were discussing the case, Juror No. 4 would not "provide any argument or any reasoning" for her views. Id. at 3609:17–3610:2. They also stated they did not believe Juror No. 4 was looking "at all evidence in good faith." Id. 3611:2–9.

The Court initially questioned Juror No. 4 along with all the other jurors in numerical order. Juror No. 4 indicated that she was aware of Juror Communication No. 8 but "didn't know what was in the note." Id. at 3576:19–22. She stated that she was aware that someone stated they were "mad/angry" at the prosecution but did not admit that she was the person who made the At-Issue Comment. See id. at 3577:7–9. She stated that there were problems with deliberations because "[t]here is a person that doesn't agree with the rest of them" and the jury was "having trouble getting anywhere." Id. at 3576:25–3577:6; see also id. at 3577:12–13 (stating there was "frustration" amongst jurors because the deliberations "can't progress"). Juror No. 4 denied that there was a bias taking place, said that the jury was discussing the evidence, and said that she believed all jurors were following the Court's instructions. Id. at 3577:10–24.

The Court then agreed to ask limited follow-up questions to certain jurors, including asking Juror No. 4 who made the At-Issue Comment. See id. at 3611:20–3613:2, 3613:15–3614:7. Juror No. 4 admitted that she made the At-Issue Comment and claimed she did not make any other, similar comments. Id. at 3614:9–16. The Court then asked Juror No. 4 if she would like explain why she made the At-Issue Comment. Id. at 3614:17–22. She initially stated she made the comment in "frustration" because "when we're going through the evidence, I'm seeing it one way, people [are] seeing it another way." Id. at 3615:5–15. But she then followed up that she made the comment based on "frustration of the culmination of the experience . . . It was just like I went to

the restroom and I came back out and I was just like—you know, it was like the experience of what we're going through." Id. at 3615:20–3616:1.

Following the individual voir dire, the Government moved to have Juror No. 4 discharged for cause based on an improper bias. See id. at 3617:16–17. The Defendants opposed the motion, and the Court heard oral argument from the Parties. See id. at 3618:14–3655:17. The Court then recessed to review the individual voir dire responses and assess whether to discharge Juror No. 4. See id. at 3656:5–9.

Ultimately, after considering all relevant evidence holistically, the Court determined that it was legally appropriate and necessary to discharge Juror No. 4. The Court explained that each juror had credibly testified that they believed, to some degree, that Juror No. 4 was biased against the Government, was not considering all of the evidence, or was not following the Court's instructions on the law. See id. 3662:1–3667:9. It explained that all three of these issues are interconnected, because failure to consider all of the evidence or follow the Court's instructions was likely a product of an impermissible bias. See id. 3664:5–15. This overwhelming and consistent evidence gave the Court "great pause about [Juror No. 4's] ability to be fair and impartial." See id. at 3667:1–7.

The Court then explained that Juror No. 4's behavior and conduct during the trial and voir dire corroborated the conclusion that she had an impermissible bias. Notably, the At-Issue Comment was not the first concern raised about Juror No. 4. During the trial, the Court and Government had observed Juror No. 4 on several occasions appear to non-verbally communicate with Defendants. See id. at 3627:13–3628:9. On one occasion, she appeared to "demonstrative[ly] . . . mouth the words" that she was willing "to go a little longer" towards the Defendants after the Court had recessed for the day. Id. 3628:17–22; see also id. at 3667:23–3668:17. The following

day, the Court gave a neutral instruction to all jurors reminding them that they can and should not communicate with any of the Parties or counsel. See id. at 3629:2–21. In response, the Court noticed Juror No. 4 have a "visceral" and "dramatic" reaction to the instruction as if "she was caught doing something and she didn't like that [the Court] said [the instruction] because [the Court] was directing it to her." Id. at 3629:2–21; 3668:22–3669:10.

Juror No. 4 also appeared to be an incredible witness during the voir dire. It was notable that when initially responding to the Court's questions, Juror No. 4 opted to speak only in the third-person and only admitted to making the At-Issue Comment when directly asked by the Court. See id. at 3669:15–3671:3. She stated she had only made the At-Issue Comment, but multiple jurors had testified that she had made other, similar comments. See id. at 3671:4–6, 3672:10–17, 3673:2–5. And her explanation about the comment being motivated by "frustration with the process" seemed contrived because, as the Court explained, frustration with the length or intensity of the deliberative process should not create "anger" or "frustration" towards one particular party. See id. at 3671:7–3672:8; 3672:18–3673:19.

The Court then explained, based on the totality of this evidence, the current situation was different from the initial rounds of questioning seen in prior Third Circuit cases and made discharge appropriate here. See id. 3673:20–3676:4. In fact, it would have been "a dereliction of [the Court's] duty to remain indifferent and pretend this isn't a problem . . . that this bias and this failure to follow [the Court's] instructions wasn't real [when] it is." Id. at 3676:5–15. It therefore discharged Juror No. 4 and replaced her with an alternate juror. See id. at 3676:15–16.

**D. The Verdict**

The reconstituted jury deliberated for nearly an additional day-and-a-half. Then, on December 12, 2025, the jury returned its verdict. See ECF No. 214. Brown was found guilty on all ten counts. See Trial Tr. at 3707:9–3709:3. Shaw was found guilty on Counts One through

Seven. See id. at 3709:4–3710:9. Upon polling, each juror confirmed that the jury was hopelessly deadlocked on Counts Eight through Ten as to Shaw. See id. at 3703:5–3704:24. Upon agreement from the Parties, the Court declared a mistrial with respect to those three Counts. See id. at 3705:7–24.

### E. The Instant Motions

Pursuant to a stipulated briefing schedule, in January 2026, Defendants filed the Acquittal Motions. See ECF Nos. 227, 231, 232. Then, in early March 2026, they filed the First NTMs. See ECF Nos. 235, 236. All briefing was completed by April 2026.

Then, in July 2026, the Defendants filed the Second NTMs. See ECF Nos. 244, 246. The Second NTMs are based on the Third Circuit's precedential decision in United States v. Evans, 175 F.4th 443 (3d Cir. 2026), which issued on May 19, 2026. Pursuant to this decision, Defendants contend certain witness testimony was wrongly admitted and a new trial is warranted.

## II. Legal Standard

Pursuant to Rule 29, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant bears the "heavy burden" of showing the evidence's insufficiency. United States v. John-Baptiste, 747 F.3d 186, 201 (3d Cir. 2014) (quotation marks omitted). The court views the record in its totality and in the light most favorable to the government. See United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005); United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984). It assesses whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt, see Brodie, 403 F.3d at 133, and may not overturn the jury's verdict unless "the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt," United States v. McNeill, 887 F.2d 448, 450 (3d Cir. 1989) (quotation marks omitted). "In

determining whether evidence is sufficient, [the Court] will not weigh evidence or determine the credibility of witnesses." United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992).

Pursuant to Rule 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant may invoke Rule 33 and request a new trial where "the jury verdict is contrary to the weight of the evidence" and the Court believes "an innocent person has been convicted." United States v. Silveus, 542 F.3d 993, 1004–05 (3d Cir. 2008). Alternatively, a defendant may invoke Rule 33 and request a new trial if it is "reasonably possible that [an alleged] error, or combination of errors, substantially influenced the jury's decision" to convict. United States v. Crim, 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)). The decision of whether to grant the motion for a new trial ultimately rests within the sound discretion of the district court. See United States v. Saada, 212 F.3d 210, 215 (3d Cir. 2000).

## III. DISCUSSION

### A. The Acquittal Motions

#### 1. The Evidence Is Sufficient to Sustain Each Defendant's Conviction Under Count One.

In each Acquittal Motion, Shaw and Brown primarily contend that the evidence proffered by the Government is insufficient to sustain their convictions under Count One, conspiracy to commit murder in aid of racketeering. Shaw specifically argues that the Government failed to offer sufficient evidence that he entered a conspiracy to commit the Murders. See Shaw Acquittal Mot. at 4–7. Brown, by contrast, contends that certain evidence necessary to sustain a conviction against him under Count One was provided by incredible witnesses, was undermined by DNA evidence presented from the crime scene, or was unsupported by necessary physical corroboration.

See Brown Acquittal Mot. at 2–8. Their arguments lack merit, and the Court concludes that the evidence offered was more than sufficient to sustain their convictions under Count One.

To prove Count One, the Government was required to offer evidence proving beyond a reasonable doubt that:

> First, that an enterprise engaged in or affecting interstate or foreign commerce existed;
>
> Second, that the enterprise was engaged in racketeering activity;
>
> Third, that the defendants conspired to commit the alleged murders; and
>
> Fourth, the defendants' general purpose in conspiring to commit the murders was either to gain entrance to, or maintain or increase position in, the enterprise.

See Trial Tr. at 3081:21–3082:5; see also 18 U.S.C. § 1959(a); United States v. Jones, 566 F.3d 353, 363 (3d Cir. 2009); United States v. Merritt, No. 07-550-04, 2014 WL 3535064, at *16–17 (E.D. Pa. July 16, 2014). The evidence offered by the Government was sufficient to satisfy each of these elements.

**a. The Evidence Permitted the Jury to Find Beyond a Reasonable Doubt that Brown and Shaw Were Guilty of Count One.**

For the first element of Count One, the Government was required to prove that a criminal enterprise existed and that its activities were related to interstate commerce. A criminal enterprise includes any "group of individuals" that "is engaged in, or the activities of which affect, interstate or foreign commerce." See 18 U.S.C. § 1959(b)(2). A criminal enterprise's "nexus with interstate commerce" that is required to prove a racketeering offense "is minimal." Rose v. Bartle, 871 F.2d 331, 357 (3d Cir. 1989) (quotation marks omitted); see also United States v. Daniels, 48 F. App'x 409, 416–17 (3d Cir. 2002) (noting a "de minimis effect" on interstate commerce "will suffice"). "[O]nly the criminal enterprise must affect interstate commerce—not the conduct of each individual defendant." Rose, 871 F.2d at 357 n.38 (quotation marks omitted). And because "[i]t is well settled, and Congress has explicitly noted, that drug trafficking activities affect interstate

commerce," Rinaldi v. Zickefoose, 532 F. App'x 64, 65 n.3 (3d Cir. 2013) (citing 21 U.S.C. § 801(3)), the Third Circuit has concluded that any evidence that a criminal enterprise "was engaged in drug trafficking" satisfies the interstate commerce requirement, Daniels, 48 F. App'x at 416–17.

Here, various witnesses testified that they had personal knowledge and familiarity with the existence of the street gang NHB, establishing the existence of the criminal enterprise. See, e.g., Trial Tr. at 117:16–118:22; 1119:20–1120:6; 1747:1–3; 2134:11–16; 2437:2–2440:11. They also testified that they had personal knowledge that members of NHB—including the Defendants—engaged in drug trafficking activity in and around NHB's territory in Jersey City on behalf of the gang. See id. at 118:14–18; 203:12–204:20; 2142:22–2143:20; 2146:16–2147:2; 2149:10–2150:22; 2436:9–14; 2439:14–2440:1; 2446:11–23; 2698:2–11. That is sufficient to satisfy the interstate commerce element. In any event, the Government also introduced evidence that the Defendants committed the Murders using a stolen U-Haul truck with an Arizona license plate, i.e., that they committed the crime with a vehicle that traveled interstate. See id. 1296:22–1297:6; 1316:15–1317:1. This evidence is also sufficient to satisfy the "minimal" nexus with interstate commerce required to prove a racketeering offense. Rose, 871 F.2d at 357.

For the second element, the Government was required to prove that the criminal enterprise engaged in racketeering activity, defined as "any of a large number of specified illegal acts." See United States v. Grayson, 795 F.2d 278, 288 (3d Cir. 1986) (citing 18 U.S.C. § 1961(1)); see also 18 U.S.C. § 1959(b)(1). The evidence of NHB's drug dealing activity was sufficient to satisfy this element. See supra at 17; 18 U.S.C. § 1961(1)(A) (defining "racketeering activity" to include "dealing in a controlled substance"). NHB's involvement in and use of retaliatory shootings was also sufficient to satisfy this element. See Trial Tr. at 175:21–176:7; 177:7–12; 2142:22–25;

2143:21–2145:4; 18 U.S.C. § 1961(1)(A) (defining "racketeering activity" to include "any act or threat involving murder"). And the Defendants' conspiracy to commit the Murders, which was motivated in part to further NHB's objectives in its ongoing feud with SMM, was also independently sufficient to satisfy this element. See infra at 20; United States v. Irizarry, 341 F.3d 273, 296 (3d Cir. 2003) ("[I]f the predicate conspiracy relates to the affairs of the RICO enterprise, it can be charged as part of that enterprise's pattern of racketeering activity in a RICO prosecution[.]").

For the third element, the Government was required to prove that the Defendants conspired to commit the alleged Murders, and for the fourth element, it had to prove that the Defendants did so to maintain or increase their position or status within NHB. The evidence related to these two elements may (and here, does) overlap, as proving a conspiracy to commit murder through circumstantial evidence can be accomplished by providing evidence of the motive for committing the murder.

Specifically, to establish participation in a criminal conspiracy, the evidence must show "a unity of purpose, intent to achieve a common goal, and an agreement to work together toward that goal."[3] United States v. Reyeros, 537 F.3d 270, 277 (3d Cir. 2008) (quotation marks omitted). Simply put, "the essence of a conspiracy is an agreement." United States v. Nolan, 718 F.2d 589, 595 (3d Cir. 1983). The Government need not prove the existence of a formal agreement. See id. Rather, "it is enough that the parties have a tacit understanding to carry out the prohibited conduct." See United States v. Giampa, 904 F. Supp. 235, 326 n.104 (D.N.J. 1995) (quotation marks omitted). This understanding may be proven through circumstantial evidence. See Nolan, 718

[3] Because "Congress did not radically alter traditional conspiracy law except to the extent that it proposed a dramatically new conspiratorial objective" when it passed the statute criminalizing conspiring to engage in racketeering activity, courts apply "traditional conspiracy law" to assess whether defendants entered into a conspiracy. See United States v. Pungitore, 910 F.2d 1084, 1147–48 (3d Cir. 1990).

F.2d at 595; see also United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986) ("[T]he existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding." (quotation marks omitted)). Indeed, because "[a] conspiracy is by its very nature clandestine . . . circumstantial evidence is sometimes the sole support for a conviction." United States v. McGlory, 968 F.2d 309, 322 (3d Cir. 1992). Courts have determined that probative evidence of a conspiracy includes: "sharing a common motive; presence in a situation where one could assume participants would not allow bystanders; repeated acts; mutual knowledge with joint action; and the giving out of misinformation to cover up." United States v. Davis, 810 F.2d 474, 477 (5th Cir. 1987) (citing, inter alia, United States v. Ellis, 595 F.2d 154, 160 (3d Cir. 1979)).

Here, when the "evidence presented by the Government [is] taken as a whole," United States v. Picciotti, 40 F. Supp. 2d 242, 245 (D.N.J. 1999), and inferences are drawn from this evidence in favor of the Government, see United States v. Pecora, 798 F.2d 614, 618 (3d Cir. 1986), a reasonable jury could conclude that Brown and Shaw entered a conspiracy to commit the Murders to promote the interests of NHB (and their interests within the gang). For starters, the evidence shows that the Defendants had a motive to commit the Murders. See Davis, 810 F.2d at 477 (citing Ellis, 595 F.2d at 160). The jury received evidence that Brown and Shaw were: (1) often seen associating with NHB members; (2) had tattoos indicative of NHB membership; (3) indicated association with NHB through posts on their social media accounts and in music they wrote; and (4) sold narcotics in NHB territory, which was something only NHB members could do. See Trial Tr. at 124:1–6; 166:16–168:5; 176:8–179:16; 227:1–22; 2146:16–2147:12; 2149:10–17; 2439:14–23; 2440:12–2441:13; 2698:2–11; 2714:1–2714:19; Gov't Exs. 105-1, 105-

2, 105-4, 105-11, 106-5, 317, 329, 331, 332. From this, the jury could reasonably infer that Brown and Shaw were members of NHB.

The jury also received evidence that NHB was involved in a long-running feud with SMM, and as a product of this feud, members of SMM killed multiple members of NHB, including Brown's brother. See Trial Tr. at 129:16–23; 283:6–18; 2143:21–2145:4; 2151:3–2154:11; 2156:18–2157:9; 2162:17–2165:8; 2441:14–2442:7; 2522:15–2525:16. It received evidence of rap songs written by Shaw that repeatedly referenced deceased members of NHB that had been killed by SMM. See, e.g., Gov't Ex. 329. It received evidence that Bailey was a high-ranking member of SMM. See id. at 2144:8–14. It received evidence that the Defendants could improve their standing within NHB by engaging in violent behavior like killing rivals. See id. at 250:7–15; 1909:17–1911:13; 2136:17–2137:8; 2198:25–2199:6. It received evidence that Brown and Bailey got into an altercation outside of a Newark nightclub during which Brown stole Bailey's gold chain. See id. at 1773:2–1778:19. And it received evidence of Brown and Shaw posting photos on social media with Bailey's stolen chain on the morning of January 1, 2017, which precipitated Bailey's decision to post the key chains with photos of NHB gang members that SMM had murdered and Brown's and Shaw's attempts on Bailey's life. See id.; see also id. at 662:7–12; 1153:8–1164:15; 1174:7–1177:2; 1178:6–23; 1780:22–1781:25. From this collective evidence, the jury could have reasonably determined that the Defendants, as members of NHB, were motivated to kill SMM's leader (and his significant other) based on the long-running and bloody feud between NHB and SMM. Doing so would show their commitment to NHB, and at least maintain—or potentially improve—their standing within the organization.

Additionally, the evidence presented suggested Brown and Shaw engaged in "repeated" attempts on Bailey's life, that they were "jointly" involved in planning the Murders, and that they

partook in efforts to "cover-up" the Murders. See Davis, 810 F.2d at 477 (citing Ellis, 595 F.2d at 160). Brown made an initial attempt on Bailey's life ten days before the Murders, on January 6, 2017, and after the attempt went to Shaw's residence and left the gun he used with Shaw. See id. at 1783:25–1786:7; 1787:4–1794:12; 1796:2–21; 1798:1–3. In the lead up to the Murders, Shaw procured the stolen U-Haul truck that the Defendants used to travel to and from Bailey's apartment. See id. at 985:3–987:1; 988:24–989:11; 991:3–16; 1014:2–1021:18; 1299:2–1300:24. Brown and Shaw were seen buying walkie-talkies in a nearby Wal-Mart that were of the same model as the walkie-talkie found with Chisolm at the scene of the Murders. See id. at 608:19–610:11; 1481:19–1484:14; 1486:20–1488:7; 1490:23–1491:19; 1492:13–1495:19. They wore dreadlock wigs in an attempt to disguise themselves. See id. at 569:16–19; 1524:20–1529:13; 2198:9–19. Video surveillance and cell-site location data placed Brown and Shaw (with and without Chisolm) at the relevant locations—Bayside Place, Fulton Avenue, and Stegman Street—around the time of the Murders. See id. at 389:9–390:2; 390:23–391:6; 395:18–22; 448:4–15; 500:17–503:10; 506:23–508:20; 513:11–16; 538:1–11; 542:1–543:1; 547:17–549:7; 550:17–552:21; 1630:6–1643:23; 1672:17–1673:4. Shaw's black Acura TL is seen as the only vehicle on Stegman Street right after the Murders. See id. at 1673:5–1677:14. Subsequently, cell-site location data and witness testimony demonstrated that Shaw picked up Brown and traveled to Paterson to dispose of the gun used in the Murders, and that Shaw then had his Acura TL cleaned the morning directly after the Murders. See id. at 1277:20–1279:9; 1698:24–1702:2; 1809:12–23; 1948:25–1949:3; 1950:6–24. In a call the day following the Murders, Brown recounted that he was laying "low," was changing his phone number, and that he "can't talk" about Chisolm's death and could only say that "sh*t got . . . sh*t was f*cked up, you heard." See id. at 2682:5–2684:19; Gov't Ex. 302. Finally, Brown also deleted all of his text messages with Shaw from the day of the Murders. See Trial Tr. at

2695:4–2697:3; Gov't Ex. 300–19.[4] A jury could reasonably infer from this collective evidence that the Defendants conspired together to commit the Murders. And, based on this entire record, the jury could sensibly conclude that Brown and Shaw were guilty of Count One beyond a reasonable doubt.

**b. Shaw's Counterarguments Are Unavailing.**

Shaw's efforts to oppose this conclusion are uncompelling. He admits that the record establishes an association among himself, Brown, and Chisolm, as well as his knowledge of certain illegal activities related to the Murders. See Shaw Acquittal Mot. at 5–6. But he nonetheless resists the conclusion that the evidence sufficiently supports his involvement in a conspiracy to commit the Murders. See id. He does so by: (1) pointing to isolated testimony that that he claims contradicts a finding of motive; or (2) emphasizing the lack of direct evidence tying him to location of the Murders. See id. at 6–7.

At this stage, however, the evidence must be assessed in its totality, not in isolation. See Pecora, 798 F.2d at 618. And a lack of certain direct evidence is irrelevant because circumstantial evidence alone can be sufficient to sustain a conviction for conspiracy. See Nolan, 718 F.2d at 595; McGlory, 968 F.2d at 322. Here, the circumstantial evidence produced by the Government is sufficient to support a finding that Shaw joined the conspiracy to commit the Murders in aid of racketeering activity.

**c. Brown's Counterarguments Are Unavailing.**

Brown's counterarguments fare no better than Shaw's. He principally argues that the testimony of the Government's two cooperating witnesses, Richardson and Austin, are:

[4] Most notably, this rendition also does not include statements from two different witnesses that Brown admitted to committing the Murders, and that one of these witnesses confirmed Brown said Shaw was present at the crime scene. See id. at 1806:2–1808:18; 2196:13–2197:9.

(1) necessary to sustain his conviction under Count One, and (2) that no rational jury could believe either witness. But the record outside of Richardson's and Austin's testimony is significant and supports each element to prove Count One. See supra at 19–22. Moreover, Brown argues that these witnesses are not credible based on contradictions or circumstances related to their testimony. But he is, in effect, asking the Court to improperly weigh in on each witness's credibility. See Casper, 956 F.2d at 421 ("In determining whether evidence is sufficient, [the Court] will not weigh evidence or determine the credibility of witnesses."). And, he asks the Court to act contrary to law and resolve that issue in his favor. This is something it cannot do. See United States v. Brown, No. 22-108, 2022 WL 16855129, at *2 (D.N.J. Nov. 10, 2022) (citing United States v. Scanzello, 822 F.2d 18, 21 (3d Cir. 1987), for the proposition that when resolving a motion for acquittal, "[c]redibility conflicts . . . are to be resolved in the government's favor").

In any event, the contradictions he cites are also the subject of competing interpretations of the record. The weight attributed to these contradictions was properly left to the jury. As to Richardson, Brown argues that he was unbelievable because: (1) his testimony about the murder weapon being a 9-millimeter handgun contradicted notes and a report generated from a pretrial interview Richardson conducted with FBI Special Agent Aaron Perkins, in which he allegedly stated the murder weapon was the 10-millimeter handgun; and (2) his testimony about the January 6, 2017 shooting involving eighteen shots fired was contradicted by the physical evidence collected following the shooting, in which only twelve 10-millimeter shell casings were recovered. See Brown Acquittal Mot. at 2–3. But that fails to account for the entire record (or reasonable inferences that can be drawn from it).

For starters, Richardson testified that he never informed Perkins that the murder weapon was the 10-millimeter handgun. See Trial. Tr. at 1798:1–3; 1885:12–1887:9. Perkins also

testified—as part of a rebuttal case presented by Brown—that his notes and report mistakenly denoted Richardson as stating the 10-millimeter handgun was the murder weapon. See id. at 2906:22–2907:1; 2909:11–2912:5; 2916:6–2918:9. Brown took the opportunity to question Richardson and Perkins about this discrepancy and issue; the credibility of their explanations (and whether to believe them) should remain the jury's prerogative. Similarly, Richardson testified that Brown fired "[a]bout 18" shots during the January 6, 2017 shooting. Id. at 1790:1–4 (emphasis added). Sergeant Shanna Moore, who responded to the scene of this shooting, testified that she recovered twelve 10-millimeter shell casings strewn across seven houses along Dwight Street (including one which was lodged inside a vehicle). See id. 1982:23–1988:17. Whether Richardson was intentionally lying, misremembering, or incorrectly estimating the number of shots fired was something Brown could have scrutinized on cross-examination. The conclusion drawn from the testimony is ultimately a credibility determination that should be reserved to the jury. [5]

Notably, Richardson's testimony about various events related to both the January 6 and January 16, 2017 shootings were corroborated by independent evidence. For example, he testified that Brown used a 10-millimeter weapon in the January 6 attempt to kill Bailey, and 10-millimeter shell casings were recovered from the scene. See id. at 1787:4–1790:9; 1797:1–15; 1982:23–1988:17. Richardson testified that Brown contacted Shaw to drop off the 10-millimeter gun to him after failing to kill Bailey on January 6, 2017, and phone records revealed that Shaw was the first person Brown called after the shooting. See id. at 1790:16–1794:9; Gov't Ex. 615. Regarding the night of the Murders, Richardson testified that after he got off work at 11 p.m., he met up with Brown on Sip Avenue to try to learn what had occurred, and cell-site location data placed Brown

[5] Alternatively, given the scene described by Sergeant Moore, the jury may also reasonably have inferred that investigators did not find and collect all the shell casings from the January 6 shooting, in which case Richardson's testimony may have been truthful.

around Sip Avenue at 11:35 p.m. See id. at 1799:8–1801:13; 1948:9–19. Richardson testified that he obtained a hotel room at Brown's request (where Brown admitted to murdering Bailey and Lee), and cell-site location data placed Brown near that hotel around 2 a.m. See id. at 1801:14–1802:8; 1948:25–1949:3. And Richardson testified that Brown stated he was going with Shaw to Paterson to dispose of the murder weapon, and cell-site location data placed Brown and Shaw in and around Paterson after 3 a.m. See id. at 1809:7–18; 1950:6–24. If the jury chose to believe Richardson's testimony on the issues Brown criticizes above, this corroboration of various key issues makes it entirely reasonable for it to have done so. In any event, as previously explained, the Court must resolve this credibility conflict in the Government's favor at this juncture. See Brown, 2022 WL 16855129, at *2 (citing Scanzello, 822 F.2d at 21).

As to Austin, Brown contends that he was incredible because Austin's claim that he and Brown discussed Brown's involvement in the Murders while both were being held in the Hudson County Jail (the "Jail") through the ventilation system is implausible. See Brown Acquittal Mot. at 4–5. Specifically, he argues that the Government presented no evidence to establish a foundation that such a conversation could have occurred based on the Jail's HVAC design or Brown's and Austin's placement in the Jail on the night they were both present there. See id. But this, again, fails to account for the entire record.

Following Austin's direct examination, Defense counsel pressed Austin on the credibility of his claim that he conversed with Brown through the air vents. See Trial Tr. at 2213:3–2273:23. Defense counsel then requested and received the Court's permission to visit the Jail. See id. at 1739:18–1741:11. The Government then called Lieutenant Michael Arrigo, an officer employed at the Jail during the relevant time period, to corroborate portions of Austin's account. See id. at 2345:24–2347:5. He confirmed that both Brown and Austin were held in the same section of the

Jail on the same day in January 2018. See 2348:1–2355:4. He stated that Austin was held on the first floor and Brown was held on the second floor. See id. He stated that although Austin and Brown were not held in cells directly vertical to one another, prisoners could often end up in different cells on their assigned floors. See id. at 2355:5–2356:14. He explained that Austin and Brown may have therefore ended up in cells directly vertical with one another. See id. at 2368:25–2369:20. He further testified that prisoners often communicate between cells on different floors through the vents and toilets, and that prisoners could communicate through the vents with a soft tone of voice. See id. at 2356:15–2358:21. Defense counsel also had an opportunity to cross examine Arrigo. See id. 2358:25–2368:18.

Ultimately, whether the jury believed Austin's testimony hinged on credibility determinations of both Austin and Arrigo. The Court cannot supersede that assessment. See Casper, 956 F.2d at 421; United States v. Wilson, No. 14-209, 2017 WL 6328154, at *5 (E.D. Pa. Dec. 11, 2017) ("We cannot usurp the jury's role in assessing witness credibility or weighing evidence, and it is within the jury's province to accept the cooperating witnesses' . . . testimony."). Again, it must resolve that issue in the Government's favor. See Brown, 2022 WL 16855129, at *2. And, importantly, even without Arrigo's testimony, the jury could choose to weigh Austin's credibility and believe his testimony on its own if it found it reliable. Accord, e.g., United States v. Perez, 280 F.3d 318, 344 (3d Cir. 2002) (holding that "uncorroborated [cooperating] accomplice testimony may constitutionally provide the exclusive basis for a criminal conviction" as long as defense counsel had "ample opportunity to cross-examine the . . . witness[]" (quotation marks omitted)). It may have well done so, considering Austin testified that Brown informed him he and his coconspirators wore dreadlock wigs when they committed the Murders—a fact corroborated

by the surveillance video that showed the Defendants on Bayside Place and Stegman Street around the time of the Murders. See Trial Tr. at 569:16–19; 1524:20–1529:13; 2198:9–20.

Brown's additional arguments are unpersuasive. He first contends that a bloodstain identified in the common hallway of the apartment building where the Murders occurred, which DNA testing identified as belonging to unknown third party, "undermines the Government's theory that [] Brown was the shooter or otherwise physically present as a principal in the triple homicide." See Brown Acquittal Mot. at 5–6. In fact, Brown goes so far as to contend that this evidence "affirmatively points to someone other than Brown or Shaw" committing the Murders. See id. at 6. But the argument relies on the Court drawing a negative inference from this evidence in Brown's favor. In the current posture, the "government must be given the benefit of inferences that may be drawn from the evidence," Pecora, 798 F.2d at 618, and the reasonable inference is that a bloodstain located outside of the crime scene in a public hallway may have been from an individual and event that preceded the Murders, see Trial Tr. at 630:8–10; 729:11–20.

Finally, Brown protests that the Government's circumstantial evidence tying him to the Murders lacks objective, physical corroboration including certain ballistics, eyewitness, and cell-site location data evidence. See Brown Acquittal Mot. at 7–8. However, as noted, the Government was permitted to prove its case that Brown was involved in a conspiracy to commit the Murders through circumstantial evidence alone. See Nolan, 718 F.2d at 595; McGlory, 968 F.2d at 322. His complaint about the type of evidence used and lack of corroboration is a complaint about how much weight the evidence proffered by the Government should be given. The Court is in no position to reweigh that evidence, and it finds the evidence admitted was sufficient for the jury to reasonably conclude that Brown was involved in a conspiracy to commit the Murders in aid of racketeering. See Casper, 956 F.2d at 421.

**2. The Evidence Is Sufficient to Sustain Shaw's Conviction Under Counts Two Through Seven.**

In the Shaw Acquittal Motion, Shaw presses two additional arguments. First, he argues that the Government failed to produce sufficient evidence to support the first element of Counts Two and Five, murder in aid of racketeering, because it did not offer sufficient evidence that NHB was a criminal enterprise affecting interstate commerce. See Shaw Acquittal Mot. at 7–9. For the reasons explained above, the Court finds the evidence admitted by the Government was sufficient to prove the interstate commerce element of each of these Counts. See supra at 16–17. It denies Shaw's Motion as to each of these Counts.

Separately, Shaw argues that the Government failed to produce evidence to Support Counts Three, Four, Six and Seven. See Shaw Acquittal Mot. at 2–3, 9–10. His argument is dependent on his contention as to Counts Two and Five. To prove these Counts, the government had to produce evidence that the Murders were committed. Shaw argues that in failing to produce sufficient evidence to sustain Counts Two and Five (i.e., that the Defendants committed murder), the Government could not produce the necessary evidence to sustain Counts Three, Four, Six, and Seven (i.e., that the Defendants used a firearm during a crime a violence and caused death through the use of a firearm). See id. Because the Court has rejected Shaw's argument as to Counts Two and Five, it also rejects his argument as to Counts Three and Six.

**3. The Evidence Is Sufficient to Sustain Brown's Conviction Under Counts Two Through Ten.**

In the Brown Acquittal Motion, Brown argues that the Government's failure to produce sufficient evidence to support Count One necessarily means the Government cannot sustain its burden on Counts Two through Ten. See Brown Acquittal Mot. at 5, 9. Because Brown's argument as to Counts Two through Ten was dependent on his contention that the evidence was

insufficient to sustain Count One, and because the Court has rejected that argument, it also rejects his argument as to Counts Two through Ten.

* * * * *

On a motion for acquittal, "[t]he jury's verdict may not be overturned unless 'the record contains no evidence, regardless of how it is weighted, from which the jury could find guilty beyond a reasonable doubt.'" United States v. Higgins, No. 22-44, 2025 WL 1695947, at *1 (D. Del. June 17, 2025) (quoting McNeill, 887 F.2d at 450); accord United States v. Pungitore, 910 F.2d 1084, 1129 (3d Cir. 1990) ("The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt.").

In other words, acquittal "should be confined to cases where the prosecution's failure is clear." Brodie, 403 F.3d at 133 (quotation marks omitted). This is not such a case. Although heavily built on circumstantial evidence, the Government's case presented significant evidence from which a reasonable jury could find Brown and Shaw guilty of the Murders. There is no basis to disturb their verdicts doing so. Accordingly, the Acquittal Motions are each denied.

### B. The First Motions for a New Trial

Brown and Shaw each separately move for a new trial on the ground that the Court's discharge of Juror No. 4 was improper. Both Defendants argue that the Court erred because the record developed during the voir dire showed that Juror No. 4's anti-Government position was based on her assessment of the merits and not an impermissible bias. See Brown First NTM at 7–10; Shaw First NTM at 32–40. Brown also argues the Court's assessment of Juror No. 4's credibility was improper. See Brown First NTM at 10–11.

Before dismissing Juror No. 4, the Court acknowledged that it is "important . . . to be very careful in making findings based on exactly what the jurors said." See Trial Tr. at 3655:10–12. It closely scrutinized the record, in its entire context, and reached the decision that Juror No. 4 must

be discharged for failing to abide by her oath and evaluate the evidence impartially. After carefully examining the record again post-verdict, the Court reaffirms that decision and concludes it was correct to discharge Juror No. 4.

When presented with substantial evidence of a juror's potential misconduct, courts conduct a voir dire of the jury to investigate the allegations. See Boone, 458 F.3d at 329; see also United States v. Fattah, 914 F.3d 112, 147–48 (3d Cir. 2019). Following that investigation, pursuant to Federal Rule of Criminal Procedure 23(b), a district court may "excuse a deliberating juror for good cause." Fattah, 914 F.3d at 149. "Good cause exists where a juror refuses to apply the law, refuses to follow the court's instructions, refuses to deliberate with his or her fellow jurors, or demonstrates bias," id., and there is "no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence," United States v. Kemp, 500 F.3d 257, 304 (3d Cir. 2007). This is because "a juror who refuses to deliberate or who commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role." Boone, 458 F.3d at 329. In contrast, "[g]ood cause does not exist when there is reasonable but sustained disagreement about how a juror views the evidence." Fattah, 914 F.3d at 149.

In assessing whether a juror's misconduct stems from impropriety or from her view of the evidence, "[t]he Court considers the totality of what it heard from all of the jurors" during the voir dire. United States v. Parker, No. 21-400, 2022 WL 819612, at *2 (D.N.J. Mar. 18, 2022), vacated & remanded on other grounds, 2024 WL 901661 (3d Cir. Feb. 28, 2024). It also weighs the credibility of the at-issue juror and the other jurors questioned during the voir dire. Kemp, 500 F.3d at 305; Fattah, 914 F.3d at 150; Parker, 2022 WL 819612, at *3. The credibility assessment of the at-issue juror is particularly significant because her "motivations and intentions are at issue." Kemp, 500 F.3d at 305 (quotation marks and citation omitted). Accordingly, the court "should not

rely simply on the" at-issue juror's "subjective assessments of [her] own impartiality." Id. (quotation marks and citation omitted). The court has "wide latitude in making the kind of credibility determinations underlying the removal of a juror, because [its] unique perspective at the scene places [it] in a far superior position to determine the proper course of action when issues of juror disqualification arise." United States v. James, 955 F.3d 336, 346 (3d Cir. 2020) (quotation marks and citations omitted).

Here, the discharge of Juror No. 4 was necessary. This conclusion follows from the Court's collective assessment of the testimony of each of the other jurors regarding Juror No. 4's behavior during deliberations, its review of Juror No. 4's conduct during the trial, and its assessment of Juror No. 4's credibility during the individualized voir dire.[6]

### 1. All Jurors Testified that Juror No. 4 Was Engaging in Misconduct.

As in Kemp, the evidence of Juror No. 4's improper bias was "overwhelming." 500 F.3d at 304. In some fashion, each of the eleven jurors credibly and substantively testified that Juror No. 4 was biased against the prosecution. At least eight did so directly. See Trial Tr. at 3565:25–3566:12 (Juror No. 1); id. at 3570:18–24 (Juror No. 2); id. at 3587:14–23 (Juror No. 7); id. at 3589:24–3590:9, 3592:19–25 (Juror No. 8); id. at 3597:15–3598:1 (Juror No. 9); id. at 3601:25–3602:1 (Juror No. 10); id. at 3605:20–3606:5 (Juror No. 11); id. at 3608:7–11 (Juror No. 12). And many provided key information to support why they had reached that conclusion. Juror No. 1 stated that Juror No. 4 had been "repeatedly" making comments about how she was "mad/angry at the prosecution" throughout the deliberations. Id. at 3566:7–16. Juror No. 2 explained Juror No. 4 appeared to develop "a story in [her] head" early in the trial and was not willing to let go of

[6] Neither Defendant contests the Court's decision to conduct an individualized voir dire of all jurors. The Court maintains that its decision to do so was based on "substantial evidence" of potential juror misconduct and relies on the justifications it provided on the record in support of this decision. See Trial Tr. at 3551:1–3557:16; Boone, 458 F.3d at 329.

her view despite the evidence presented. Id. at 3569:18–3570:7. Juror No. 7 stated Juror No. 4 was deliberating "based on feelings." Id. at 3587:24–3588:18. Juror No. 8 stated that Juror No. 4 had made various comments throughout the deliberations referring to the prosecution as the "feds" with a tone that gave off an "anti-fed, anti[-]government" bias. Id. at 3591:2–15; 3594:20–3595:1. Juror No. 9 explained Juror No. 4 appeared to have "a thumb on the side of the government that is unfair" and constantly referred to the prosecution as "the feds" in a "context" that was "not positive." Id. at 3596:24–3597:10; 3597:15–3598:1; 3599:3–6. Juror No. 11 explicitly referred to Juror No. 4's bias as "impenetrable" because she was making "very emotional comments" and jurors could not "work with" or "logically talk with her" about the evidence. Id. at 3605:20–3606:17. And Juror No. 12 stated that Juror No. 4 "appeared to have a set of opinions that is . . . not necessarily related to the case and it is being applied to the case" and that she refused to trust the evidence because it was presented by the Government. Id. at 3608:7–11; 3609:7–15.

This group of jurors also indicated that Juror No. 4 was engaged in other misconduct. All eight stated that Juror No. 4 was not considering all the evidence or was not deliberating about the evidence in good faith. See id. at 3564:16–3565:11; 3566:20–23 (Juror No. 1); id. at 3568:15–3569:5; 3570:8–17 (Juror No. 2); id. at 3586:17–23; 3587:24–3588:18 (Juror No. 7); id. at 3592:1–6, 3594:8–17 (Juror No. 8); id. at 3600:1–12 (Juror No. 9); id. at 3603:9–13 (Juror No. 10); id. at 3606:6–19 (Juror No. 11); id. at 3609:17–3610:2; 3611:2–9 (Juror No. 12). Notably, Juror No. 1 specifically explained that the jury was "having problems" with deliberations because Juror No. 4 was "refusing" to consider the evidence and "ignoring some witness testimony and some evidence." Id. at 3564:5–3565:12; 3566:20–23. Juror No. 2 stated Juror No. 4 was not considering all the evidence and they were "disturbed" by a pattern during deliberations where the jury would "start to make progress," and then when they believed they could move on, Juror No. 4 brought

them "back to square one." Id. at 3568:15–3569:5. Juror No. 9 stated that when other jurors asked Juror No. 4 to explain the basis for her positions, she would not provide an answer and instead respond, "I don't know, I'm just going to call out sick." Id. at 3600:1–12. And Juror No. 12 stated that Juror No. 4 would not "provide any argument or any reasoning" for her views and was not looking "at all evidence in good faith." Id. at 3609:17–3610:2; 3611:2–9.

At least six of the jurors from this group also stated that they believed Juror No. 4 was not following the Court's instructions on the law. See id. at 3570:8–17 (Juror No. 2); id. at 3588:7–18 (Juror No. 7); id. at 3591:2–15 (Juror No. 8); id. at 3598:13–3599:3 (Juror No. 9); id. at 3606:12–19 (Juror No. 11); id. at 3611:2–9 (Juror No. 12). Most notably, Juror No. 9 specifically expressed that Juror No. 4 was failing to follow the Court's instruction on how to consider the evidence because she "often speculates, asks for evidence that doesn't exist, that was not submitted, [and] does not seem to be following the rules as they've been written in the charges." Id. at 3598:9–12. They also noted that the "reasonable doubt" instruction that explains the standard does not require one hundred percent assurance or mathematical certainty, but Juror No. 4 would state that she could not be "one hundred percent sure" that the Defendants were guilty. Id. at 3598:13–3599:3. When challenged that she was not following this instruction by other jurors, Juror No. 4 would "dismiss" their concerns. Id.

Although the remaining three jurors did not explicitly indicate that they believed Juror No. 4 was biased, they did raise issues with her behavior during deliberations. Juror No. 3 stated that Juror No. 4 may not have been considering all the evidence. See id. at 3574:10–22; 3574:23–3575:1. They also hesitated before responding to the Court's inquiry as to whether all jurors were following the Court's legal instructions. See id. at 3575:16–18. Juror No. 5 stated that they were unsure if Juror No. 4 was biased, but noted that Juror No. 4 had said she felt "manipulated" and

that it was "hard for [her] to accept the evidence brought to [her] and being able to use that based off of how [she] feels personally." Id. at 3579:15–23. They further stated that Juror No. 4 was not following the Court's instructions and appeared to be acting on a "hunch." Id. at 3580:2–9; 3580:17–24. And Juror No. 6 stated that although they believed all jurors were discussing the evidence and following the Court's instructions, "it would be fair to question [Juror No. 4's] objectivity." Id. at 3583:4–21; 3616:14–18. Thus, even Juror No. 4's "staunchest defender[s]" each identified some form of misconduct undermining the view that Juror No. 4 was not tainted by impermissible bias. Kemp, 500 F.3d at 305.

Brown and Shaw argue that Juror No. 4's conflict with the other jurors was based on her view of the evidence. They support this claim, in part, by pointing to short, direct "yes or no" responses certain jurors may have given to the Court's questions regarding whether all jurors were discussing the evidence or following the Court's instructions. But multiple jurors indicated that they felt "constrained" and could not "fulsomely answer" the Court's questions because the Court repeatedly cautioned jurors not to disclose the substance of deliberations. Trial Tr. at 3661:17–21; see also id. at 3573:20–23, 3575:2–18 (Juror No. 3); id. at 3593:1–3 (Juror No. 8); id. at 3602:8–11 (Juror No. 10). When the substantive responses each juror was able to provide are analyzed, it becomes clear that the succinct responses on which Brown and Shaw rely represent isolated outliers. See id. at 3661:17–3662:9. The Court must assess the voir dire testimonial record in its entirety, not in isolation. See Parker, 2022 WL 819612, at *2. Doing so reveals one common denominator: Juror No. 4 was engaged in some form of misconduct indicative of bias.

In short, all eleven jurors indicated that Juror No. 4 was biased, was not considering all the evidence, or was failing to follow the Court's instructions in some capacity. Nine of these jurors—Jurors Nos. 1, 2, 6, 7, 8, 9, 10, 11, and 12—all indicated to some degree that Juror No. 4 was

biased. And the remaining jurors—Juror Nos. 3 and 5—indicated Juror No. 4 was not considering all the evidence or failing to deliberate in good faith. That latter failure identified by Juror Nos. 3 and 5 likely represents "a manifestation of underlying bias" because "if a juror makes up her mind based on beliefs formed before the trial began, she would have no reason to discuss the evidence with other jurors." Kemp, 500 F.3d at 305. "The Court weighs the testimony of the other jurors heavily as they each referred to different instances that some of them witnessed, heard[,] or saw independently," and their testimony "bolster[s] the Court's confidence that their concerns are not the result of 'group think' or an impermissible effort to remove a juror because she viewed the evidence in a different light." Parker, 2022 WL 819612, at *3. Instead, their testimony strongly indicates Juror No. 4 was impermissibly biased.

### 2. Juror No. 4's Conduct During Trial and Her Responses During Voir Dire Were Indicative of an Impermissible Bias.

The conclusion that Juror No. 4 was biased is further bolstered by her own conduct and credibility. For starters, during the trial, the Court recognized that Juror No. 4 appeared to be "fixated on the Defendants." Trial Tr. at 3667:25. On several occasions, Juror No. 4 appeared to "inappropriate[ly]" engage in non-verbal communication with Defendants. See id. at 3627:13–3629:1; 3668:18–20. Then, on Day 9 of the trial, she "demonstrative[ly] . . . mouth[ed] the words" that she was willing "to go a little longer" towards the Defendants after the Court had recessed for the day. Id. 3628:17–22; see also id. at 1851:21–1852:8; 3667:23–3668:17. The following day, the Court gave a neutral instruction to all jurors reminding them that they may not communicate with any of the Parties. See id. at 3629:2–21. Juror No. 4's response was telling. She had a "visceral" and "dramatic" reaction that brought to mind "the phrase to clutch your pearls," as if she had been caught doing something despite not being accused of anything. Id. The Court found her behavior "disproportionate" and "bordering on inappropriate," as if "she was caught doing

something and she didn't like that [the Court] said [the instruction] because [it] was directing it to her." Id. at 3629:16–21; 3668:22–3669:10.[7]

Juror No. 4's own conduct during the voir dire further confirmed her bias. During her initial round of questioning, Juror No. 4 referred to herself in the third-person. See id. at 3577:7–9. She admitted that she was aware someone said they were "mad/angry" at the prosecution, but declined to admit that she was the one who said it. See id.; see also id. at 3669:15–3671:3. Although the Court did not initially ask Juror No. 4 who made the At-Issue Comment, it was abnormal and concerning that a layperson did not respond under the circumstances by noting that she had made the comment.[8] In the Court's follow-up questioning, Juror No. 4 only admitted she made the At-Issue Comment when directly asked about it, and she emphasized that she did not make any other, similar comments. Id. at 3614:9–16. That was contradicted by multiple jurors who had said she had made such comments "repeatedly." Id. at 3566:7–16 (Juror No. 1); see also id. at 3591:2–15; 3594:20–3595:14 (Juror No. 8); id. at 3596:24–3597:10; 3599:3–6 (Juror No. 9).

---

[7] Notably, several jurors indicated that Juror No.4's anti-Government bias appeared to develop during the trial. See id. at 3569:18–3570:7 (Juror No. 2 stating Juror No. 4 appeared to develop "a story in [her] head" early in the trial that she could not reject despite the evidence subsequently presented); id. at 3579:15–23 (Juror No. 5 explaining that Juror No. 4 stated she felt "manipulated" by the prosecution); id. at 3592:11–18; 3594:8–12 (Juror No. 8 explaining that they believed Juror No. 4's bias developed "during the proceedings," that she "has a problem with how [the case] was presented," and that she felt the prosecution was "feeding" her a "narrative"). This testimony helps contextualize Juror No. 4's behavior throughout the trial and supports the view that her later misconduct during deliberations was the product of a burgeoning, improper bias.

[8] For example, when Juror No. 9 was asked about the At-Issue Comment and note, they indicated that they were the author of the note. See Trial Tr. at 3596:10–15. Shaw argues that Juror No. 9 committed misconduct because she submitted notes that indicated the jury's vote on all Counts. See Shaw First NTM at 23–24 (citing Juror Communication No. 8 stating votes were shifting from "unanimous to not"). However, as the Court already noted, Juror Communication No. 8 was ambiguous and, at best, only potentially implied the jury's vote as to Count One, but not as to any other Counts. See Trial Tr. at 3651:25–3653:9. Shaw's assertion was also contradicted by subsequent proceedings, as the jury ultimately was deadlocked and a mistrial was declared on three Counts against him. See id. at 3703:5–3704:24. In any event, Juror No. 9's communication of the jury shifting from "unanimous to not," ECF No. 207, pales in comparison to the note produced in Boone, in which the Third Circuit affirmed the district court's decision holding that a note identifying misconduct by a specific juror and a specific, numerical vote breakdown on all counts did not constitute misconduct, see 458 F.2d at 323–24, 326–27. Shaw also contends Juror No. 9 authored the note to have Juror No. 4 removed because they disagreed with Juror No. 4 about the evidence. See Shaw First NTM at 37. But Juror Communication No. 8 indicated that multiple "jurors" were "concerned a bias may be taking place in light of the evidence," ECF No. 207, and all jurors indicated Juror No. 4 was biased in some capacity.

Her explanation as to why she made the comment was also illogical. If Juror No. 4 was "frustrated" with the deliberative process and her fellow jurors, why would she express anger at the Government? See id. at 3671:7–3672:8, 3672:18–3673:19. Indeed, her explanation appears to be a "constructed post hoc story" developed "to try and obfuscate [her] bias." Kemp, 500 F.3d at 305.

Brown contends that it is improper for the Court to consider Juror No. 4's credibility or rely upon it as a basis to justify her discharge. See Brown First NTM at 10–11. But that argument is squarely rejected by the caselaw, which makes clear that the "demeanor of the pertinent juror is important to juror misconduct determinations" and cautions district courts not to "rely simply on the jurors' subjective assessments of their own impartiality." Kemp, 500 F.3d at 305 (quotation marks and citations omitted); see also James, 955 F.3d at 347 (upholding the dismissal of a juror and the seating of an alternate where part of the basis for the dismissal included the district court's finding that the juror was not being candid with the court); Parker, 2022 WL 819612, at *3 (similar). Simply put, Juror No. 4's credibility was fair game for the Court to assess, and it determined that her "answers seem[ed] to be designed to mislead [the Court] and [] found her an incredible witness and not believable." Trial Tr. at 3673:18–19.

Brown and Shaw also each argue that Juror No. 4 responded that she was not biased, was considering the evidence and following the Court's instructions, and that the At-Issue Comment was also based on her seeing the evidence "one way" and other jurors seeing it "another way." See Trial Tr. at 3577:10–24; 3615:5–15. This, they argue, supports a "reasonable possibility" her disagreement with other jurors was based on her view of the evidence. But Defendants appear to be pushing the Court to embrace the "any possibility" standard Kemp squarely rejected in favor of the "reasonable possibility" standard that offers the Court necessary "leeway in handling difficult

juror issues." 500 F.3d at 304. Juror No. 4's succinct, "yes or no" responses to the Court's initial questioning were entirely inconsistent with the answers provided by the other eleven jurors, undermining the veracity of her responses. See id. at 305 (noting that where the at-issue juror's statement "is so inconsistent with all the other reports" received from the jurors, it is "simply unbelievable"). And "[a]lthough her demeanor was calm," her explanation as to why she made the At-Issue Comment appeared "devoid of any hint of emotion or concern despite the seriousness of the claims against her." Parker, 2022 WL 819612, at *3. It was also then coupled with an illogical response. And the initial evidence-based justification is illogical itself—if Juror No.4 had a disagreement based on the evidence, it does not make sense why she would express that frustration through "anger" at one of the Parties. Simply put, Juror No. 4's self-serving responses are insufficient to overcome an independent record, taken collectively, that indicates "no reasonable possibility" her disagreement stemmed from a different view of the evidence.

* * * * *

In sum, the Court concludes that based "on the totality of the evidence before it," dismissal of Juror No. 4 was "not only appropriate but necessary." Parker, 2022 WL 819612, at *3. The evidence of bias here is much stronger than in other cases where courts determined the discharge of a juror was appropriate. See, e.g., Fattah, 914 F.3d at 141–45 (discharging at-issue juror after (1) receiving two notes identifying potential bias and a failure to deliberate, (2) questioning four jurors, (3) questioning the courtroom deputy about a comment that was overheard, and (4) questioning the at-issue juror multiple times); Parker, 2022 WL 819612, at *1–3 (dismissing at issue-juror after (1) receiving two reports identifying a failure to deliberate, and (2) questioning each juror and receiving affirmative testimony from eight jurors that the at-issue juror was not deliberating). Indeed, it is comparable with the record held sufficient to justify the discharge of

the at-issue juror in Kemp. Like there, here, the Court "received near-unanimous reports that Juror [No. 4] was biased, and after hearing a manifestly incredible rendition from Juror [No. 4], the Court discharged" her. Kemp, 500 F.3d at 306.

The record, when considered in totality, leaves no "reasonable possibility" that Juror No. 4's misconduct stemmed from her view of the evidence. Id. at 304. It makes clear that she had an impermissible bias against the Government. It would have been a "dereliction of duty" for this Court to have remained indifferent and not discharged Juror No. 4, and the Court reaches that same conclusion now. Id. at 306 (quotation marks omitted). Accordingly, the First NTMs are each denied.

### C. The Second Motions for a New Trial

In light of the Third Circuit's recent decision in United States v. Evans, 175 F.4th 443 (3d Cir. 2026), Defendants again move for a new trial. In each of the Second NTMs, they contend, pursuant to Evans, that the Court permitted law-enforcement officers testifying as lay witnesses to offer impermissible expert opinion testimony. Shaw contends that certain portions of testimony offered by Detective Costigan, Captain Stambuli, Sergeant Cherilien, Detective Porter, and Sergeant Bradley (collectively, the "Officer Witnesses") were improperly admitted. See Shaw Second NTM at 7–28. Brown separately argues that certain portions of testimony offered by Sergeant Cherilien and Sergeant Bradley, were wrongly admitted. See Brown Second NTM at 2–3 (collectively with excerpts objected to by Shaw, the "Contested Testimony"). The Court holds that, even under Evans, most of the Contested Testimony was permissible lay opinion testimony. But even if all of the Contested Testimony was excluded, the admission of these excerpts constituted harmless error.

Under Federal Rule of Evidence 701, a lay witness may offer opinion testimony so long as the testimony is: "(a) rationally based on the witness's perception [the "Perception

Requirement"]; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue [the "Helpfulness Requirement"]; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [the "Non-Expert Requirement"]." Fed. R. Evid. 701. The foundation of a lay witness's opinion testimony must be based on the witness's personal knowledge. See United States v. Fulton, 837 F.3d 281, 291 (3d Cir. 2016). And the Third Circuit "has long held that knowledge gained from work experiences can foster" the foundation for lay opinions, even those "that may be technical or specialized in nature." Evans, 175 F.4th at 452 (citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993)); see also Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190, 1201 (3d Cir. 1995) (explaining that lay opinion testimony must be "grounded either in experience or specialized knowledge"). But because both "lay and expert opinions may be based on the witness's firsthand observations and professional experience," managing the "distinction between expert and lay opinions is not always a straightforward task." Id. To do so, the district court is tasked with ensuring the lay opinion offered fits squarely within the three foundational requirements established by Rule 701.

First, the Perception Requirement mandates that the witness "'have firsthand knowledge of the factual predicates that form the basis of the opinion,'" which "ensures that . . . the witness's logical inferences are based on" exposure to the facts. Id. at 451 (quoting Gov't of V.I. v. Knight, 989 F.2d 619, 629 (3d Cir. 1993). Second, the Helpfulness Requirement demands that the witness's opinion "help the fact-finder understand testimony or determine a fact in issue," specifically by offering an opinion that "'aids or clarifies an issue that the jury would not otherwise be as competent to understand.'" Id. (quoting Fulton, 837 F.3d at 297). Finally, the Non-Expert Requirement requires that the lay opinion be based on knowledge obtained "from a process of

reasoning familiar in everyday life," not through a process "mastered only by specialists in" a specific field. Id.

Here, the Court enforced these specific boundaries throughout the testimony of each of the Officer Witnesses. It maintains that, even considering Evans, nearly all of the Contested Testimony represents proper lay opinion testimony. It addresses each witness in turn.[9]

**1. Contested Testimony of Detective Costigan.**

Shaw argues that certain portions of Detective Costigan's Contested Testimony in which he opined on: (1) indicators of gang membership; (2) gang members' practices related to drug dealing and retaliatory shootings; and (3) the significance of certain numbers, words and colors, constitute impermissible expert testimony. He asserts that this testimony was either not grounded in the facts of this case, or was not based on Detective Costigan's own perceptions. The Court disagrees.

To prove Count One, conspiracy to commit murder in aid of racketeering (as well as several other Counts), the Government was required to provide evidence proving the existence of a criminal enterprise; that the Defendants were members of that criminal enterprise; that the criminal enterprise was engaged in racketeering activity; and, that the conspiracy to commit the Murders was intended to maintain or further the Defendants standing in the enterprise. See supra at 16. Each portion of Detective Costigan's Contested Testimony provided evidence to support these

[9] Brown's and Shaw's Second NTMs are untimely. See Fed. R. Crim. P. 33(b)(2); ECF No. 227 (establishing scheduling order for new trial motions). Each argues that the delay in filing these Motions is based on "excusable neglect" because Evans represents "a significant intervening change in the law." Shaw Second NTM at 6–7; see also Brown Second NTM at 1. The Court disagrees. Evans did not assert that it was deciding an issue of first impression, and its recitation of Rule 701's requirements was grounded in precedential Third Circuit caselaw. See 175 F.4th at 450–453. In other words, Evans did not change the law; it applied it as it stands to a particular set of facts. Defendants also argue that the Second NTMs otherwise satisfy the "excusable neglect" standard enumerated in United States v. Kennedy, 354 F. App'x 632, 636 (3d Cir. 2009), because their Motions present no risk of prejudice, were filed within months of the jury's verdicts and while the First NTMs were still pending, and were filed shortly after Evans was decided. See Shaw Second NTM at 7; Brown Second NTM at 1. The Court agrees with this contention and proceeds to evaluate each portion of the Contested Testimony on its merits.

elements, and therefore was related to "fact[s] in issue." Evans, 175 F.4th at 451. And, when the full context of his testimony is considered, it is clear that his testimony was grounded in his "firsthand knowledge" and personal perceptions. Id.

Shaw first objects to portions of Detective Costigan's testimony in which he describes certain indicators of gang membership and specific indicators used by members of NHB and SMM to identify themselves as members of each gang. See Shaw Second NTM at 8–10; see also Trial Tr. at 122:21–124:13; 125:24–126:9; 127:13–128:6. Detective Costigan testified that he had developed a familiarity and understanding of how NHB and SMM members identified themselves because he patrolled in and investigated the areas where these gangs operated as a member from Jersey City's street crime unit from 2007 to 2018. See Trial Tr. at 111:9–20; 116:10–117:10; 117:22–118:22. The indicators he described were thus based on his "firsthand knowledge" and were "logical inferences" based on his exposure to the facts. Evans, 175 F.4th at 451. Moreover, facts about how NHB and SMM members identified themselves were relevant to prove the existence of the criminal enterprise (NHB) and establish a foundation for the gang feud that the Government argued was a part of the Defendants' motivation for committing the Murders. See supra at 16, 19–20. They were, in turn, clearly "fact[s] in issue" based on firsthand testimony. Evans, 175 F.4th at 451.

Shaw also identifies as problematic portions of Detective Costigan's testimony in which he discusses gang drug dealing and retaliatory shooting practices. See Shaw Second NTM at 10–12; see also Trial Tr. at 175:21–178:4. But Detective Costigan stated that his understanding of these practices was developed from his investigation of these specific crimes after they were committed by members of NHB or SMM. See Trial Tr. at 175:21–176:7; 177:7–23. Drug dealing and retaliatory shootings are also examples a racketeering activity—an element the Government

was required to establish to prove Count One. See supra at 16–18. This testimony was therefore based on Detective Costigan's "firsthand knowledge," was related to "fact[s] in issue," and was rooted in "facts or experiences . . . before the jury." Evans, 175 F.4th at 451, 453.

Shaw further contests portions of Detective Costigan's testimony in which he explains the terms "199," "ROC," and "Free Bidwell"; opines on the meaning of red and black clothing; or opines on the meaning of red writing that appeared in Shaw's social media posts. See Shaw Second NTM 12–13; see also Trial Tr. at 236:8–238:17. Again, though, Detective Costigan testified that he became familiar with and learned how these terms or colors were used to identify NHB members through his firsthand experience patrolling and investigating crimes related to NHB. See Trial Tr. at 111:9–20; 117:22–118:22; 122:21–124:13; 125:24–126:9; 127:13–128:6. He also testified that he observed Shaw in areas he learned were NHB territory during his patrols at least "fifty times." Id. at 152:3–153:10. And this testimony provides relevant evidence to prove the existence of NHB and Shaw's membership in NHB. See supra at 16–17, 19–20. With this foundational context, it is evident that Detective Costigan's testimony represents "inferences" drawn from facts of which he had "firsthand knowledge," and that were "at issue" in this case. See Evans, 175 F.4th at 451; see also United States v. Walpole, 543 F. App'x 224, 228 (3d Cir. 2013) (holding an FBI agent was permitted to testify as a lay witness about the meaning of certain technical computer terms because "her experience investigating online crimes gave her familiarity with the terms").

For these reasons, each of the portions of Detective Costigan's Contested Testimony constituted permissible lay opinion testimony under Rule 701.

**2. Contested Testimony of Captain Stambuli.**

Shaw contends that certain portions of Captain Stambuli's Contested Testimony in which he opined on: (1) gang members' use of social media and other ways gang members identify

themselves; (2) Chisolm's appearance at the crime scene; and (3) trends of violence in Jersey City, constitute impermissible expert opinions. Similar to Detective Costigan, he asserts that this testimony was either not grounded in the facts of this case, or were not based on Captain Stambuli's own perceptions. Again, the Court disagrees.

To prove Count One, the Government was required to provide evidence proving the existence of a criminal enterprise and that the Defendants were members of that criminal enterprise. See supra at 16. Most portions of Captain Stambuli's Contested Testimony provided evidence regarding these two issues, so they were related to "fact[s] in issue." Evans, 175 F.4th at 451. And his testimony was based on his "firsthand knowledge" and personal perceptions. Id.

Shaw first opposes a portion of Captain Stambuli's testimony in which he generally describes how gang members use social media, particularly after another gang member his killed. See Shaw Second NTM at 14; see also Trial Tr. at 1110:20–1111:20. He also contests testimony describing how gang members identify their membership in a specific gang through interviews or social media. See Shaw Second NTM at 17–18; see also Trial Tr. at 1130:11–24. According to Shaw, it is not clear that this testimony was based on facts Captain Stambuli personally perceived. See Shaw Second NTM at 14. Even if it was, he claims Captain Stambuli's testimony on these issues was not relevant to the facts of this case. See id. at 14, 18. But Captain Stambuli testified that he was involved in hundreds of homicide investigations involving gangs, including at least five involving members of NHB. See Trial Tr. at 1115:4–1117:20; 1120:25–1121:18; 1126:2–1128:10. As part of these NHB-specific investigations, he also testified about how living members—including Shaw—identified themselves as members of NHB through social media posts paying homage to the murdered NHB members. See id. at 1128:11–1130:24. And he testified that he would interview members of NHB as part of these investigations. See, e.g., id. at

1128:13–20. This Contested Testimony was clearly based on his "firsthand knowledge" of facts he learned through is "work experience." Evans, 175 F.4th at 451–52. And it provided relevant evidence of "fact[s] in issue"—namely, how the Defendants could and did identify their membership in NHB. Id. at 451.

Shaw next argues that a portion of Captain Stambuli's testimony in which he stated that Chisolm's clothing at the crime scene made him appear "as a robber" was improper because it was based on his "general knowledge of individuals who commit robberies." Shaw Second NTM at 18; see also Trial Tr. at 1137:6–8. The Court agrees that the record does not indicate that any evidence was admitted to the jury explaining the crime scene of the Murders was first investigated as a potential robbery, or why the crime scene was initially treated that way. But Captain Stambuli's testimony, when read in the full context of his response to the at-issue question, appears to be describing his initial impression of the crime scene when he arrived. It is not an opinion based on factual knowledge that could be "mastered only by specialists in the field." Evans, 175 F.4th at 452. Chisolm was found dressed in black clothing, wearing a mask and black gloves, with a two-way walkie talkie, laying outside a couple's apartment building. See Trial Tr. at 450:7–451:10; 689:25–690:5; 1326:16–20. A lay witness may provide opinions based on observation and common sense, and a reasonable observer of this scene could have viewed Chisolm as a robber. This is permissible under Rule 701. However, even is this testimony was improper, its admission was harmless error. See infra at 56–57.

Shaw last objects to a portion of Captain Stambuli's testimony in which he testifies about trends of gang violence in Jersey City. See Shaw Second NTM at 15–17; see also Trial Tr. at 1117:21–1120:24. As part of this Contested Testimony, Captain Stambuli identified where certain gangs operate, including areas in Jersey City where SMM and NHB operated. Shaw argues that

this testimony was based on Captain Stambuli's general knowledge obtained from the hundreds of homicide investigations he conducted, but that the facts of those investigations were not before the jury. See Shaw Second NTM at 16–17. Consequently, he argues this testimony was impermissible. See id. The Court holds otherwise.

The first portion of the challenged excerpt, in which Captain Stambuli describes areas of general gang violence throughout Jersey City, relates to knowledge he obtained in his work experience as an officer investigating homicides in this area. See Trial Tr. at 1117:21–1119:7. And it provided facts that would "help the fact-finder understand [his] testimony" because it presented relevant background about the proliferation of gang violence throughout Jersey City to help the jury contextualize the feud between SMM and NHB that was central to the Government's theory of the case. See Evans, 175 F.4th at 451.[10]

The second portion of the challenged excerpt in which Captain Stambuli describes the areas in which specific gangs, particularly NHB and SMM, operated in Jersey City was also appropriate lay witness testimony. See Trial Tr. at 1119:20–1120:24. Again, Captain Stambuli made clear that he extensively investigated homicides related to (and in fact, made arrests of members of) these two gangs. See id. at 1115:4–1117:20; 1120:25–1121:18; 1126:2–1128:10. His personal knowledge of where each gang operated was derived from his "work experience" and facts that he perceived through these investigations. Evans, 175 F.4th at 452. The locations controlled and operated by each of these gangs were also "fact[s] in issue," because presence in these areas could be an indicator of gang membership. Id. at 451.

[10] If a narrower construction of relevancy is applied and this testimony is considered to be about facts that were not "in issue," Evans, 175 F.4th at 451, the Court nonetheless finds that the admission of this testimony was harmless error, see infra at 56–57.

For these reasons, the challenged portions of Captain Stambuli's Contested Testimony constituted permissible lay opinions under Rule 701.

### 3. Contested Testimony of Sergeant Cherilien and Detective Porter Regarding Shaw's Black Acura TL Sedan.

Shaw argues that portions of both Sergeant Cherilien's and Detective Porter's Contested Testimony identifying a vehicle in certain video surveillance footage as Shaw's black Acura TL constitute improper expert testimony because their opinions were based on "knowledge from facts or experiences not before the jury." See Shaw Second NTM at 19–23; see also Trial Tr. at 1489:15–1490:19; 1518:1–15; 1582:14–1584:21; 1587:9–1590:14. Indeed, Shaw asserts that Detective Porter never stated a basis for his knowledge beyond a "basic Google image search," the results of which were never offered into evidence. See Shaw Second NTM at 23. The Court disagrees.

Both Sergeant Cherilien and Detective Porter each testified that they personally saw and analyzed Shaw's Acura TL after it was seized by the Government. See Trial Tr. at 1487:15–1488:25; 1585:10–1586:6. They also reviewed and scrutinized the video surveillance footage that the Government argued showed Shaw's Acura TL in notable locations on the evening of and day following the Murders. See, e.g., id. at 1484:1–1485:8; 1512:19–1514:11; 1564:5–13; 1694:9–23; 1727:14–19. Photos of Shaw's Acura TL were admitted into evidence. See id. at 1488:1–20; 1586:13–1588:25; Gov't Exs. 104-3, 104-4. So were the relevant video surveillance clips. See, e.g., Trial Tr. at 1485:2–14; 1514:12–22; 1564:5–18. Those clips provided a basis for the jury to infer, inter alia, that Brown and Shaw went to a Wal-Mart to purchase walkie-talkies to use during the Murders; that Brown and Shaw were around the area of the Murders shortly after the Murders occurred; and that Shaw had his vehicle cleaned the following morning to cover-up the Defendants' actions. See id. at 608:19–610:11; 1277:20–1279:9; 1481:19–1484:14; 1486:20–

1488:7; 1490:23–1491:19; 1492:13–1495:19; 1673:5–1677:14; 1698:24–1702:2. This evidence was therefore relevant to concluding the Defendants entered a conspiracy to commit the Murders. See supra at 19–22.

With this context, it becomes clear that Sergeant Cherilien's and Detective Porter's testimony were rooted in "firsthand knowledge" and their personal perceptions of Shaw's actual vehicle and the relevant surveillance testimony, and was related to "fact[s] in issue" and based on evidence that was presented to the jury. Evans, 175 F.4th at 451. Moreover, the specific elements of the vehicle that each described to make the comparison between Shaw's vehicle and the vehicle in the surveillance footage were a product of each's "work experience" and "specialized knowledge" developed as investigators, through which they learned what features of vehicles to focus on to help make identifications like the type they made for the jury. Evans, 175 F.4th at 451–52. In other words, their testimony represented the work crime investigators do as part of their jobs. These excerpts of Contested Testimony thus constituted permissible lay opinion testimony under Rule 701. Accord United States v. Patel, No. 24-1798, 2025 WL 1577556, at *2 (3d Cir. June 4, 2025) (holding that the lead investigator was permitted to testify that he believed a robbery was staged because his opinion was "based on his extensive investigation of the crime and rewatching the surveillance footage" and it related to a "fact in issue").

**4. Contested Testimony of Sergeant Cherilien and Sergeant Bradley Regarding Certain Coded Language.**

Brown argues, based on Evans, that certain Contested Testimony provided by Sergeant Cherilien and Sergeant Bradley interpreting Brown's use of the phrases "bust a move" and "I'm low" in phone conversations was impermissible. See Brown Second NTM at 1–2. His argument fails, however, because Evans has no relevance to this specific issue.

A line of Third Circuit precedent before Evans established a clear rule of law: "lay witnesses may offer opinions about the meaning of recorded conversations if the witness's opinions are helpful in determining a relevant fact and, to an 'uninitiated listener,' the speaker 'speaks as if he were using code.'" United States v. Diaz, 951 F.3d 148, 157 (3d Cir. 2020) (quoting United States v. De Peri, 778 F.2d 963, 977 (3d Cir. 1985)). These witnesses need not be "participants to the coded conversation," and instead may be investigators providing an interpretation that is "rationally based on [their] perception of the information reviewed." United States v. Salgado, No. 22-1878, 2023 WL 1097765, at *2 (3d Cir. Jan. 30, 2023) (citing United States v. Leo, 941 F.2d 181, 193 (3d Cir. 1991)). The district court is responsible for "vigorously polic[ing] the government's examination" of this type of testimony to "ensure the witness 'is not asked to interpret relatively clear statements.'" Diaz, 951 F.3d at 157 (quoting De Peri, 778 F.2d at 978)).

Here, the Court did this for all arguably "coded terms." After careful scrutiny and consideration, it permitted a tempered interpretation of the phrase "bust a move." See Trial Tr. at 1361:12–1381:21; 1461:8–1464:1. It did the same with Brown's reference to being "low" in a call the day after the Murders. See id. at 2311:10–2312:14. Both Sergeant Cherilien and Sergeant Bradley provided their interpretation of these phrases based on their experiences as investigators in Jersey City and from their review of these calls as part of their investigations of the Murders, and the Court limited their testimony to what it determined were fair and reasonable interpretations of these phrases. See id. at 1374:13–17; 1506:18–1512:10; 2622:5–2625:1; 2629:3–2634:4; 2644:14–2645:2; 2681:12–2683:19. The Court also permitted the interpretation of other language that it determined represented "coded terms." See, e.g., id. at 2297:9–14; 2308:3–21. And it denied interpretive efforts where the language presented "relatively clear statements" equally

accessible to the jury. See, e.g., id. at 2305:12–17; 2306:21–25; 2307:1–2308:2; De Peri, 778 F.3d at 978.

Evans did not address or discuss the issue of lay witnesses testifying about "coded terms" in any capacity. Nor did it have reason to do so, as the at-issue testimony in that case did not involve the interpretation of any arguably coded language. In any event, to the extent Evans conflicts with the prior precedent on "coded terms," the Court is bound to follow the Third Circuit's earlier pronouncements. See Liang v. I.N.S., 206 F.3d 308, 318 (3d Cir. 2000) (holding that a panel of the Third Circuit cannot overrule a prior panel precedent); United States v. Monaco, 23 F.3d 793, 803 (3d Cir. 1994) (holding that "[t]o the extent that a decision of a later panel conflicts with existing circuit precedent, we are bound by the earlier, not the later, decision"). Accordingly, Brown's arguments regarding this Contested Testimony are rejected. It was properly admitted under Rule 701.

**5. Other Contested Testimony of Sergeant Cherilien.**

Shaw also contests a portion of Sergeant Cherilien's Contested Testimony in which he opined from his "training and experience" that individuals "absolutely" change clothes before committing murder. See Shaw Second NTM at 20; see also Trial Tr. at 1553:15–18. The record does not indicate that any evidence was admitted to the jury related to the Defendants changing clothes, or that Sergeant Cherilien personally perceived any evidence of Defendants changing clothes. This testimony was therefore improper. See Evans, 175 F.4th at 453. However, as explained below, the Court finds its admission was harmless. See infra at 56–57.

**6. Other Contested Testimony of Sergeant Bradley.**

Shaw and Brown each object to certain portions of Sergeant Bradley's testimony. Shaw argues that Sergeant Bradley's testimony in which she opined on: (1) gang members' use of social

media[11]; and (2) gang members' practices regarding their territories, references to rival gangs, and self-identification, constitute impermissible expert opinions because she was testifying about facts that were not put before the jury. See Shaw Second NTM 24–28. Brown separately contends that Sergeant Bradley's testimony identifying the time or speakers included in certain phone calls from around the time of the Murders and her "interpretation" of these calls was improper expert testimony. See Brown Second NTM at 2–3. The Court largely disagrees and concludes nearly all of Sergeant Bradley's Contested Testimony was permissible.

First, as noted when analyzing the testimony of Detective Costigan and Captain Stambuli, and relevant here, to prove Count One, the Government needed to produce evidence proving the existence of a criminal enterprise; that the Defendants were members of that criminal enterprise; and, that the conspiracy to commit the Murders was intended to maintain or further the Defendants standing in the enterprise. See supra at 16. Nearly all portions of Sergeant Bradley's testimony to which Shaw objects provided evidence to support these elements, and thus were related to "fact[s] in issue." Evans, 175 F.4th at 451. Her testimony was also grounded in her "firsthand knowledge" and personal perception of these issues. Id.

Shaw first opposes a portion of Sergeant Bradley's testimony in which she generally describes how gang members use social media, particularly explaining the types of posts and references investigators monitor to assess gang members' affiliations. See Shaw Second NTM at 24–25; see also Trial Tr. at 2430:20–2432:12. Shaw admits that Sergeant Bradley "personally perceived the facts to which she was testifying," but argues her opinion was nonetheless improper

[11] Brown also appears to object to Sergeant Bradley's testimony regarding gang members' use of social media, but he does not identify any specific excerpts that would be problematic under Evans. See Brown Second NTM at 3. Brown also raises specific objections to the same testimony identified by Shaw in his Reply. See ECF No. 250 at 2–4. The Court construes Brown as opposing the same excerpts identified as Shaw; it does not otherwise assess any testimony to which Brown has not specifically objected.

because "those facts were [] not before the jury." Shaw Second NTM at 25. But whether the Defendants were members of NHB was squarely before the jury. Sergeant Bradley testified that she investigated and identified members of NHB in person and through social media. See Trial Tr. at 2437:2–2438:13; 2439:9–2441:13. This included Shaw. See id. at 2461:10–2462:24; 2508:3–2509:20. And it also included Brown. See id. at 2486:1–2487:11. Her testimony about whether Defendants identified themselves as members of NHB through social media was related to "fact[s] in issue" and within the scope of Rule 701. Evans, 175 F.4th at 451.

Second, Shaw identifies testimony in which Sergeant Bradley testified about: (1) how rival gangs refer to one another, see Shaw Second NTM at 25–26; see also Trial Tr. at 2445:10–14; (2) how gangs remain within the bounds of their own territories and respond violently to rivals that do not respect these boundaries, see Shaw Second NTM at 26–27; see also Trial Tr. at 2443:24–2444:24; (3) how gang members identify their membership through tattoos, see Shaw Second NTM at 27–28; see also Trial Tr. at 2706:15–2707:1, 2733:24–2734:4; and (4) how gang members advance their positions within a gang, see Shaw Second NTM at 27; see also Trial Tr. at 2604:24–2605:2. Shaw argues that this testimony was "not tied to [Bradley's] perceptions of the underlying facts of th[e] case." Shaw Second NTM at 28. The Court largely disagrees.

Regarding the first excerpt, Sergeant Bradley testified that she had become familiar with the feud between NHB and SMM through her work conducting homicide investigations (and reviewing social media and video surveillance as part of these investigations), conducting field interviews of gang members, and making arrests. See Trial Tr. at 2441:14–2443:18. Through this personal knowledge, she explained that during the relevant time period NHB's only rival was SMM, see id. at 2443:19–24, and rival gang members often referred to one another as "opps" or "opponents," id. at 2445:4–14. This provided relevant foundation for her later testimony about

Shaw's social media posts that she had reviewed from the date Brown stole Bailey's chain in which he used the term "opps," see id. at 2558:11–2559:6, as well as her testimony about Shaw's rap songs in which he used the term "opps," see id. at 2725:13–2726:22. Accordingly, her initial testimony was based on her "firsthand knowledge," and her later testimony constituted "inferences" that she drew from her personal perception of the facts. Evans, 175 F.4th at 451. These facts also helped establish a foundation for Shaw's membership in NHB, as well as the gang feud that the Government argued was part of the Defendants' motivation for committing the Murders. See supra at 16, 19–20. This testimony was therefore related to "fact[s] in issue." Evans, 175 F.4th at 451.

Regarding the second excerpt, again, Sergeant Bradley testified she had a personal knowledge of the feud between NHB and SMM. See Trial Tr. at 2441:14–2443:18. Based on this knowledge, she testified that she understood NHB and SMM each occupied certain territory within Jersey City; that rival gangs were unwelcome in each other's territory; and, in turn, presence in certain areas could be an indicator of membership in NHB or SMM. See id. at 2443:25–2445:3. And she later testified that she observed Shaw and Brown in NHB territory during her investigations. See id. at 2459:10–2460:1; 2486:1–2487:4. This testimony was therefore based on facts or "inferences" drawn from facts that Sergeant Bradley personally perceived. Evans, 175 F.4th at 451. And it helped established a foundation for Shaw's and Brown's membership in NHB, making it about "fact[s] in issue." See supra at 16, 19–20; Evans, 175 F.4th at 451.

Regarding the third challenged excerpt, Sergeant Bradley testified that she had become familiar with gang members getting tattoos to denote their gang membership through her homicide investigations conducted in Jersey City. See Trial Tr. at 2706:15–2707:4. She also explained she was familiar with Defendants' tattoos. See id. Based on her personal knowledge, she opined why,

in her opinion, these tattoos denoted NHB membership. See id. at 2707:5–2713:8 (Brown); 2713:23–2714:19 (Shaw). This challenged excerpt was thus proper foundation for the "inferences" she later provided, all of which were rooted in her "personal perception" of the facts. Evans, 175 F.4th at 451. It also helped established a foundation for Shaw's and Brown's membership in NHB, making it about "fact[s] in issue." See supra at 16, 19–20; Evans, 175 F.4th at 451. It was, in turn, within the scope of Rule 701.

Regarding the fourth challenged excerpt, Sergeant Bradley testified that she had become familiar through her homicide investigations with gang members increasing their rank by, inter alia, committing murder. See id. at 2604:24–2605:2. The record does not indicate, however, that Sergeant Bradley provided testimony about how this issue related to the Murders. For example, she did not testify that she knew other NHB members had increased their position by committing prior Murders, or testify that she knew what Brown's or Shaw's rank was before each committed the Murders. This was testimony that was thus "not tied to [Sergeant Bradley's] perceptions of the underlying facts in th[e] case." Evans, 175 F.4th at 453. Accordingly, it should have been deemed inadmissible. However, its admission was harmless error. See infra at 56–57.

Brown separately contends that Sergeant Bradley provided improper testimony by identifying speakers on phone calls or noting their gang affiliations. See Brown Second NTM at 2–3; see also Trial Tr. at 2577:7–2584:13; 2647:9–2649:5; 2653:15–2660:24. He also argues that she inappropriately opined on the significance or meaning of certain phone calls (or missed calls), particularly by noting the time of certain calls and how that timing aligned with Brown's understood location on the day of the Murders. See Brown Second NTM at 2–3; see also Trial Tr. at 2577:7–2584:13; 2649:21–25; 2650:1–20; 2651:21–23; 2653:15–2660:17. Brown, however, is

mischaracterizing the nature of Sergeant Bradley's testimony and identifying testimony that does not raise any issues under Evans or Rule 701.

First, the challenged excerpts do not indicate Sergeant Bradley provided testimony on the "significance of calls," missed calls, or Brown's communications. Her testimony recites facts: who called Brown, when they called, how they were affiliated with Brown, and where Brown was determined to be (through other evidence, such as surveillance video or cell-site location data) when he received or made these calls. All inferences drawn from facts regarding the timing of these calls and Brown's location were left to the jury. Thus, this testimony does not implicate Evans. Accord Patel, 2025 WL 1577556, at *2 (holding that an investigator may testify about facts derived from her "extensive investigation of the crime").

Moreover, Sergeant Bradley established a foundation to identify the speakers, their nicknames, and their association to Brown. She explained that she either was personally familiar with these individuals through her investigations in Jersey City conducted between 2009 and 2017, or that she interacted with them during the investigation of the Murders. See Trial Tr. at 2458:14–2462:24 (Shaw); 2486:1–2487:11 (Brown); 2500:23–2501:25 (Khalil Holmes); 2502:25–2503:13 (Kevin Williams); 2504:1–13 (Lakief Greyson); 2504:18–2506:4 (Niam Richardson); 2507:9–20 (Earl Austin); 2579:21–2580:12 (Nivia Jeffrey); 2651:8–2652:11 (Mark Riddick); see also id. 2507:23–2508:2 (testifying as to certain callers relationship to Brown). Thus, this specific testimony was properly admitted.

In sum, nearly all of the challenged portions of Sergeant Bradley's Contested Testimony constituted permissible lay opinions under Rule 701. For the small excerpt that did not, the Court concludes that its admission was harmless error. See infra at 56–57.

### 7. Even If All Contested Testimony Should Have Been Inadmissible, Its Admission Constitutes Harmless Error.

Even if all of the Contested Testimony was admitted in error, the Court concludes that "the result of this error—considered alone or in the aggregate—was harmless." Evans, 175 F.4th at 453. "To find harmless error, a court must be able to say that it is highly probable that the error did not contribute to the jury's judgment of conviction." Knight, 989 F.2d at 630.

As explained, the Contested Testimony concerns evidence establishing: (1) the existence of the criminal enterprise (NHB) and its racketeering activity (drug dealing, retaliatory shootings); (2) Defendants membership in NHB; (3) Shaw's black Acura TL; and (4) Defendants' intent for committing the Murders. These facts were also sufficiently established through other witness's testimony, including uncontested portions of the testimony of certain of the Officer Witnesses and the Government's cooperating witnesses, Richardson and Austin. See, e.g., Trial Tr. at 117:16–118:22; 1119:20–1120:6; 1747:1–3; 2134:11–16; 2437:2–2440:11 (existence of NHB); id. at 1747:6–7; 1749:12–18; 2135:8–2136:6 (Brown and Shaw were members of NHB); 118:14–18; 203:12–204:20; 2142:22–2143:20; 2146:16–2147:2; 2149:10–2150:22; 2436:9–14; 2439:14–2440:1; 2446:11–23; 2698:2–11 (members of NHB, including Brown and Shaw, engaged in drug trafficking on behalf of the gang); 129:16–23; 242:6–9; 250:7–15; 283:6–18; 250:7–15; 662:7–12; 1133:1–19; 1153:8–1164:10; 1174:7–1177:2; 1178:6–23; 1773:2–1778:19; 1780:22–1781:25; 1909:17–1911:13; 2136:17–2137:8; 2143:21–2145:4; 2151:3–2154:11; 2156:18–2157:9; 2162:17–2165:8; 2198:25–2199:6; 2199:1–6; 2441:14–2442:1; 2522:15–2525:16 (testimony describing NHB's and SMM's feud, how killing Bailey could improve Defendants standing in NHB, and Brown's and Bailey's interactions antagonizing and leading up to the Murders); id. at 1388:21–22; 1487:15–21 (black Acura TL Sedan was registered to Shaw). They were also established through other physical evidence. See, e.g., Gov't Exs. 105-1, 105-2, 105-4, 105-11

(photographs of Brown's NHB tattoos); Gov't Exs. 317, 331, 332; Trial Tr. at 124:1–6; 227:1–22; 2439:17–23 (photos of Brown's and Shaw's social media posts indicating NHB association); Ex. 329 (Shaw's rap songs referencing deceased NHB members); Gov't Exs. 104-3, 104-4; Trial Tr. at 1488:1–20; 1586:13–1588:25 (photos of Shaw's black Acura TL Sedan); Trial Tr. at 1279:3–9; 1944:12–24 (cell-site location data placing Shaw at the Wal-Mart and at his residence at the time video surveillance appeared to capture Shaw exiting his black Acura TL Sedan in the Wal-Mart parking lot or before it was cleaned the morning after the Murders).

Moreover, as noted above, myriad other forms of testimonial and physical evidence were introduced that established Brown's and Shaw's planning, execution, and efforts to conceal the Murders. See supra at 20–22. In light of this record, the Court is confident that any error that may have occurred through the admission of any excerpts of the Contested Testimony was harmless.

Accordingly, the Second NTMs are also each denied.

## IV. CONCLUSION

For the foregoing reasons, the Shaw Acquittal Motion, ECF No. 231; Brown Acquittal Motion, ECF No. 232; Shaw First NTM, ECF No. 236; Brown First NTM, ECF No. 235; Shaw Second NTM, ECF No. 244; and Brown Second NTM, ECF No. 246, are each **DENIED**.

An appropriate Order will follow the entry of this Opinion.

Date: 10.01.2026

***s/ Madeline Cox Arleo***
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**